THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSHUA FOUGHT, et al.        :
                          :
      Plaintiffs,        :
      v.                  :    3:17-CV-1825
                          :    (JUDGE MARIANI)
CITY OF WILKES-BARRE,    :
PENNSYLVANIA, JOSEPH HOMZA,  :
and MARCELLA LENDACKY,    :
                          :
      Defendants.       :

## MEMORANDUM OPINION
## I. INTRODUCTION

Here the Court considers Defendants' Motion to Dismiss Plaintiffs' Second Amended

Complaint (Doc. 41).  Plaintiffs' interactions with Defendant Joseph Homza, a police officer

with the Police Department of the City of Wilkes-Barre, including encounters with Defendant

Homza's canine partner, Chase, form the basis of many of the fourteen federal and state

law claims contained in the Amended Complaint.[1]  (Doc. 36.)  Defendants seek dismissal of

all claims based on Plaintiffs' failure to state a claim upon which relief may be granted.

(Doc. 41.)  For the reasons discussed below, Defendants' Motion to Dismiss Plaintiffs'

Second Amended Complaint (Doc. 41) will be granted in part and denied in part.

---

[1] The final two claims in the Amended Complaint are both identified as "COUNT XIII."  (*See* Doc. 36 at 40, 41.)  In this Memorandum Opinion, the Court will refer to the last claim, "Plaintiff A. Falcone v. Defendants City and Lendacky" for "Negligent Retention," as Count XIV.

## II. BACKGROUND

Defendant Homza was hired as a Wilkes-Barre police officer in February 2014. (Doc. 36 ¶ 66.)  Robert P. Hughes was the Chief of Police at the time.  (*Id.* ¶ 63.)  Defendant Marcella Lendacky was appointed Chief of Police for the City of Wilkes-Barre in March 2016.  (Doc. 36 ¶ 67.)  Defendant Lendacky was responsible for evaluating the officers who applied to be a part of the canine unit.  (*Id.* ¶ 69.)  In late summer of 2016, Defendant Lendacky selected Defendant Homza to be a canine handler for the Wilkes-Barre Police Department.  (*Id.* ¶ 68.)

Pursuant to Wilkes-Barre City Police Department Special Order 1.3.9(I)(1)(a), issued on April 23, 2014, by then Chief of Police Hughes, to be considered for assignment to the canine unit a police officer "must have completed three years of service with the Wilkes-Barre City Police Department."  (*Id.* ¶¶ 63-65 (citing Exhibit A, Special Order 1.3.9).)  Defendant Homza did not complete the requisite years of service before being selected for the canine unit.  (*Id.* ¶ 66.)

### A.  <u>Plaintiff Fought</u>

On July 18, 2017, Plaintiff Fought was gathered with friends and other members of the public at Public Square ("Square") located in the area of 47 South Washington Street in Wilkes-Barre, Pennsylvania.   (Doc. 36 ¶ 22.)  At the time, Defendant Homza was on walking patrol duty at the Square with his K-9 partner, Chase.  (*Id.* ¶ 23.)  Defendant Homza approached Plaintiff Fought's group and initiated a pedestrian investigation.  (*Id.* ¶ 24.)  As

part of his investigation, Defendant Homza requested identification from Plaintiff Fought and the group he was seated with.  (*Id.* ¶ 25.)  Plaintiff Fought kneeled down to retrieve his bag and produced his identification as requested.  (*Id.* ¶ 26.)  Defendant Homza's K-9 partner began to bark and jump at Plaintiff Fought causing Plaintiff Fought to be startled.  (*Id.* ¶ 27.) Plaintiff Fought expressed concern that Defendant Homza did not have control of the dog and asked Defendant Homza to corral him.  (*Id.* ¶ 28.)  While Defendant Homza was checking to see if any in the group had outstanding warrants, Plaintiff Fought casually remarked that he "wouldn't be still standing here" if he did have an existing warrant.  (*Id.* ¶ 29.)  Plaintiff Fought and his companions began to collect and retrieve their belongings while awaiting Defendant Homza's return of Plaintiff Fought's identification.  (*Id.* ¶ 30.) Without explanation, Defendant Homza removed the leash from his dog and directed him to lie down.  (*Id.* ¶ 31.)  He then walked away from the unsecured dog back toward Plaintiff Fought.  (*Id.*)  At the time of Defendant Homza's approach, Plaintiff Fought had not been charged with a crime and had no reason to believe that he was not free to leave.  (*Id.* ¶ 32.)

Defendant Homza, without warning, then moved to take Plaintiff Fought into custody by pinning him to the ground.  (*Id.* ¶ 33.)   Specifically, Defendant Homza approached Plaintiff Fought from behind while Plaintiff was in a kneeling position and used an "arm bar" hold, placing a handcuff on one wrist and using his body weight to force Plaintiff to the ground face-first.  (*Id.* ¶ 35.)  After Defendant Homza handcuffed one of Plaintiff Fought's hands, he held onto the handcuffs, tethering Plaintiff and Defendant Homza.  (*Id.* ¶ 36.)

3

While Plaintiff Fought was under the physical control of Defendant Homza, Defendant Homza's K-9 partner, without warning or provocation, attacked Plaintiff Fought by latching onto the right side of his back.  (*Id.* ¶ 37.)  Defendant Homza stood by and watched as the dog mauled Plaintiff Fought's back while Plaintiff Fought remained handcuffed and tethered to Defendant Homza.  (*Id.* ¶ 38.)  The dog alternated between jumping up and down with Plaintiff Fought's back firmly within his jaws and chewing on Plaintiff Fought's back from a stationary position while Defendant Homza and several civilians stood by watching.  (*Id.* ¶ 39.)  Plaintiff had no means of escaping the dog's attack.  (*Id.* ¶ 40.)  Defendant Homza ultimately issued the release command and the dog immediately stopped engaging with Plaintiff Fought and retreated to Defendant Homza's side.  (*Id.* ¶ 44.)

The arrest was video recorded via cell phone by civilian bystanders and depicts Defendant Homza's conduct and the subsequent dispatch of numerous backup officers to the scene.  (*Id.* ¶ 45.)  The video also depicts Plaintiff Fought on the ground, unarmed and without any active resistance, while Defendant Homza stood over Plaintiff Fought and watched as his dog chewed on Plaintiff Fought's back.  (*Id.* ¶ 46.)  Plaintiff Fought, bloodied and without a shirt, was left on the street for an undetermined amount of time without Defendant Homza or any other responding officer offering any medical attention or aid for his injuries.  (*Id.* ¶ 47.)  Plaintiff Fought was eventually transported to Wilkes-Barre General Hospital where he had to undergo emergency surgery to close the wound on his back.  (*Id.* ¶ 48.)  After the initial surgery, Plaintiff had several more surgeries and skin graft

4

procedures before his wound could be closed.  (*Id.* ¶ 51.)  As a result, Plaintiff Fought is permanently disfigured with scars throughout his body from surgeries and skin grafts.  (*Id.* ¶ 52.)

While still hospitalized, Plaintiff Fought was formally arrested and charged with Resisting Arrest, Disorderly Conduct, and Public Drunkenness.  (Doc. 36 ¶ 45.)  On October 5, 2017, Plaintiff Fought appeared before the Honorable Thomas F. Malloy, Sr., for a preliminary hearing.  (*Id.* ¶ 15.)  All criminal charges against Plaintiff Fought were dismissed.  (*Id.*)  On October 10, 2017, Defendant Homza re-filed the criminal charges against Plaintiff Fought. (*Id.* ¶ 17.)  On January 11, 2018, a preliminary hearing was conducted and the charge of public drunkenness was dismissed for lack of evidence.  (*Id.* ¶ 18.)  The charges of resisting arrest and disorderly conduct were held for trial.  (*Id.*)   On June 12, 2018, a criminal jury trial commenced on the charges of resisting arrest and disorderly conduct.  (*Id.* ¶ 19.)  On June 14, 2018, Plaintiff Fought's Motion for Judgment for Acquittal was granted by the trial court for the disorderly conduct charge at the close of the Commonwealth's case. (*Id.* ¶ 20.)  On June 14, 2018, Plaintiff Fought was found not guilty of resisting arrest by a jury of his peers.  (*Id.* ¶ 21.)

Following Defendant Homza's incident with Plaintiff Fought, Defendant Lendacky stated to media outlets that "the officer [Defendant Homza] and the K-9 did as they were trained. . . . The incidents as reported and reviewed at this time are resultant of the regular ongoing training and policy, therefore meaning, the K-9 teams completed their jobs

5

accordingly." (Doc. 36 ¶ 74 (citing  Ex. C, "Video Sparks Debate Over Use of K-9 in WB Incident" Citizen's Voice, July 27, 2017).)

Defendants Lendacky and City of Wilkes-Barre had reason to know that neither Defendant Homza nor Chase met the safety requirements for the K-9 Unit.  (Doc. 36 ¶ 61.) During Plaintiff Fought's criminal trial, Defendant Homza testified that he and his dog failed to complete the required sixteen hours per month of training.  (*Id.* ¶ 78.)

In an article printed in the Times Leader newspaper, Wilkes-Barre K-9 trainer Paul Price is quoted as saying that Defendant Homza and his dog had failed to "make training sessions because of manpower issues." (Doc. 36 ¶ 79 (citing Ex. D, "More WB Officer Suspensions As Police Dog Sidelined For Biting 3 People" Times Leader, January 11, 2018).)  Mr. Price went on to resign from the post, stating that the Wilkes Barre K-9/Officer teams had received little required training and that "[He] can't train people that aren't there." (*Id.* ¶ 80 (citing Ex. D).)  Citing required overtime for the failure to attend K-9 training, Defendant Homza remained on patrol in Wilkes-Barre after the incident.  (Doc. 36 ¶ 81.) After Defendant City reportedly conducted an internal investigation of the incident with Plaintiff Fought, neither Defendant Lendacky nor Defendant City imposed any discipline or corrective action for Defendant Homza.  (Doc. 36 ¶¶ 89-90.)  Defendant Homza and his dog were not temporarily removed from service or required to undergo additional training.  (Doc. 36 ¶¶ 91-92.)

B. <u>Plaintiffs Anthony and Kaitlyn Falcone</u>

Plaintiffs Anthony and Kaitlyn Falcone were married at all times relevant to this action.  (Doc. 36 ¶ 110.)  On December 17, 2017, Plaintiff A. Falcone was working as a Wilkes-Barre police officer along with other members of the Wilkes-Barre Police Department, Officers Matt Smith and Jason Oliver, in the area of 27 Kidder Street in Wilkes-Barre, Pennsylvania.  (Doc. 36 ¶ 114 (citing attached Exhibit E, Administrative Review Report).)  Plaintiff A. Falcone and other officers were searching the area of 27 Kidder Street for a male suspect.  (*Id.* ¶ 115.)  Officers requested the dispatch of a K-9 unit to attempt to track the suspect who was still at large.  (*Id.* ¶ 116.)

Defendant Homza and Chase arrived on scene shortly after the request for a K-9 unit.  (*Id.* ¶ 117.)  Defendant Homza and Chase were able to track the suspect and found him hiding in a non-threatening position underneath a pick-up truck in the area of 27 Kidder Street. (*Id.* ¶ 118.)  Officer Oliver observed Defendant Homza and Chase in a "guard position" at the rear passenger quarter panel of the pick-up truck.  (*Id.* ¶ 119 (citing attached Ex. E, Administrative Review Report, pg. 2).)  Officer Oliver went to the front driver's side of the truck and crawled underneath to secure the suspect.  (*Id.* ¶ 120 (citing Ex. E, Administrative Review Report, pg. 2).)  Plaintiff A. Falcone, along with other officers, also went under the truck to take the suspect into custody. (*Id.* ¶ 121 (citing Ex. E, Administrative Review Report, pg. 3).)  At the time Plaintiff A. Falcone and other officers were trying to remove the suspect from where he was hiding underneath the truck, the suspect was

"merely failing to obey commands" and not fighting or threatening the officers.  (*Id.* ¶ 122 (citing Ex. E, Administrative Review Report, pg. 6).)

While Plaintiff A. Falcone, Officer Oliver, and Officer Smith were underneath the pickup truck, Defendant Homza, without warning, released Chase allowing the dog to run underneath the pick-up truck.  (*Id.* ¶ 123.)  While Officer Oliver was underneath the truck attempting to secure the suspect, he saw Chase run over the suspect's legs and come right for Officer Oliver's face. (*Id.* ¶ 125 (citing Ex. E, Administrative Review Report, pg. 5).) Officer Oliver instinctively put up his right arm to protect his face from Chase.  (*Id.* ¶ 126.) Chase bit down on Officer Oliver's arm "very quickly" before Officer Oliver was able to deflect Chase from his arm.  (*Id.* ¶ 127 (citing Ex. E, Administrative Review Report, pg. 5).) Plaintiff A. Falcone was right next to Officer Oliver when he was attacked by Chase.  (*Id.* ¶ 128 (citing Ex. E, Administrative Review Report, pg. 5).)  After being deflected away by Officer Oliver, Chase went directly for Plaintiff A. Falcone.  (*Id.* ¶ 129 (citing Ex. E, Administrative Review Report, pg. 5).)  Plaintiff A. Falcone, afraid for his safety, fell backwards while putting his hands and feet up to shield his face from Chase.  (*Id.* ¶ 130).) Chase then latched his jaw onto Plaintiff A. Falcone's leg and did not release.  (*Id.* ¶ 131.)

Officer Oliver had to inform Defendant Homza that Chase was biting Plaintiff A. Falcone.  (*Id.* ¶ 132.)  After securing the suspect from underneath the pick-up truck, Officer Oliver went around to the other side of the vehicle and told Defendant Homza that Plaintiff A. Falcone had been bitten by Chase and that Chase was still engaged on Plaintiff A.

8

Falcone's leg. (*Id.* ¶ 133.)   After being informed that Chase was biting Plaintiff A. Falcone, Defendant Homza came around to the side of the car where Plaintiff A. Falcone was with Chase and issued a command for Chase to release his bite. (*Id.* ¶ 134.)

Plaintiff A. Falcone was taken to Wilkes-Barre General Hospital for treatment of a dog bite to his lower right leg. (*Id.* ¶ 135.) He required substantial treatment and recovery due to the injuries he sustained. (*Id.* ¶ 158.) He was required to undergo physical therapy, has resulting loss of balance, use of his leg, and pain and suffering. (*Id.* ¶ 159.) As a result of his injuries, Plaintiff A. Falcone was unable to work for four months following this incident. (*Id.* ¶ 136.)

Special Order 1.3.9 (Q)(2)(b) states "handlers will be responsible for the actions of their assigned dog at all times." (*Id.* ¶ 137.)   Defendant Homza did not maintain visual, physical or auditory control over Chase during the incident which led to Plaintiff A. Falcone's injuries. (*Id.* ¶ 138.)   Defendant Homza failed to acknowledge that the dog had bitten two officers during the instant apprehension. (*Id.* ¶ 139.)

Defendant Homza knew that neither he nor his dog had completed the required training before responding to the call. (*Id.* ¶ 140.)   Defendant Lendacky knew or should have known that neither Defendant Homza nor his K-9 partner had completed the required training before responding to the call. (*Id.* ¶ 141.)   Defendant Homza knew or should have known that his lack of training with the K-9 would expose civilians and officers to a potentially dangerous condition. (*Id.* ¶ 142.)   Defendant City, by and through Defendant

Lendacky, failed to remove Defendant Homza from the K-9 Unit.  (*Id.* ¶ 143.)  Defendant

City, by and through Defendant Lendacky, failed to discipline Defendant Homza following

the incident with Plaintiff A. Falcone.  (*Id.* ¶ 144.)  Defendant Lendacky knew or should have

known that maintaining Defendant Homza and Chase on active status would expose

civilians and officers to a potentially dangerous condition.  (*Id.* ¶ 145.)

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

(2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal citations,

alterations, and quotations marks omitted).  A court "take[s] as true all the factual allegations

in the Complaint and the reasonable inferences that can be drawn from those facts, but . . .

disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements."  *Ethypharm S.A. France v. Abbott Labs.*, 707

F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).

Thus, "the presumption of truth attaches only to those allegations for which there is

sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President*

*of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same

presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it

does require a pleading to show 'more than a sheer possibility that a defendant has acted

unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at

678). "The plausibility determination is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting

*Iqbal*, 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as

appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

> First, the court must take note of the elements a plaintiff must plead to state a
> claim. Second, the court should identify allegations that, because they are no
> more than conclusions, are not entitled to the assumption of truth. Finally,
> where there are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an entitlement
> for relief.

*Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel*

*Valley Sch. Dist.,* 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.,* 629 F.3d

121, 130 (3d Cir.2010).

> In considering a motion to dismiss, the reviewing court examines
> the "complaint, exhibits attached to the complaint, [and] matters of public
> record," *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010), we can also
> consider documents "that a defendant attaches as an exhibit to a motion to
> dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d
> 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the
> [plaintiff's] claims are based [on them]," *Mayer,* 605 F.3d at 230. That holding
> extends to settlement material because plaintiffs "need not provide admissible
> proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.,* 12 F. Supp.3 d
> 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.,* 46 F.
> Supp.3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court
> has been clear about the scope of our review, stating we "*must* consider the
> complaint in its entirety, as well as other sources [we] ordinarily examine when
> ruling on ... motions to dismiss, in particular, documents incorporated into the
> complaint by reference, and matters of which a court may take judicial
> notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127
> S. Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

*Estate of Roman v. City of Newark,* 914 F.3d 789, 796–97 (3d Cir.), *cert. denied sub*

*nom. Estate of Roman v. City of Newark, New Jersey,* 140 S. Ct. 82, 205 L. Ed. 2d 28

(2019), and *cert. denied,* 140 S. Ct. 97, 205 L. Ed. 2d 28 (2019).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit

a curative amendment unless such an amendment would be inequitable or futile." *Phillips v.*

*Cty. of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant
> moves to dismiss it, unless the district court finds that amendment would be inequitable

or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV.  ANALYSIS

As noted above, Defendants seek dismissal of all fourteen counts contained in Plaintiffs' Second Amended Complaint.  (Doc. 41.)  They also seek dismissal of the 42 U.S.C. § 1983 claims contained in the Second Amended Complaint on the basis of qualified immunity.  (Doc. 44 at 39-41.)

### A.  Count I – Fourth Amendment Unlawful Search and Seizure

In Count I of Plaintiffs' Second Amended Complaint, Plaintiff Fought alleges that, pursuant to 42 U.S.C. § 1983, Defendant Homza violated the "Fourth Amendment – Unlawful Search and Seizure, Use of Excessive Force."  (Doc. 36 at 21.)  Defendant Homza asserts that this claim fails as a matter of law and should be dismissed with prejudice because "Mr. Fought continually resisted arrest and repeatedly ignored Officer Homza's orders to cease, prompting Officer Homza to engage his K-9 partner."  (Doc. 44 at 15 (citing Doc. 36, *generally*).)  Plaintiff Fought responds that he has sufficiently pled facts which, when construed in the light most favorable to him, demonstrate facial plausibility that Defendant Homza is liable for misconduct.  (Doc. 55 at 12-13.)  The Court concludes that Defendant Homza has not satisfied his burden of showing that Plaintiff Fought has not stated a plausible claim that he violated the Fourth Amendment.

13

As an initial matter, there is no doubt that Defendant Homza acted under color of state law within the meaning of § 1983. *See Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) (holding that defendant police officers were state actors because "[t]hey were clearly invested with the power and authority of the state"). Thus, the question becomes whether Defendant Homza deprived Plaintiff Fought of his federal constitutional rights. *See, e.g., Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007).

"[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons ... against unreasonable ... searches and seizures." U.S. Const. Amend. IV. "The Fourth Amendment applies to seizures in civil, as well as criminal, proceedings" and "the fundamental inquiry in such proceedings ... remains whether the government's conduct is reasonable under the circumstances." *Doby v. DeCrescenzo*, 171 F.3d 858, 871 (3d Cir. 1999) (citations omitted). A police officer seizes a person whenever he or she "restrains the freedom of a person to walk away." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). It is well settled that "[u]se of excessive force by a state official effectuating a search or seizure violates the Fourth Amendment." *Estate of Smith v. Marasco*, 430 F.3d 140, 148 (3d Cir. 2005). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment,

a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).

Here there is no dispute that a seizure has been alleged. *See Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (holding that a seizure occurs when, "taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") The question then becomes whether Defendant Homza's use of force was reasonable under the circumstances.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham, 490 U.S.* at 396 (internal quotation marks omitted). As stated in *Graham*,

> [b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. at 396 (internal quotation and citation omitted). In sum, "the question is 'whether the totality of the circumstances justifie[s] a particular sort of ... seizure.'" *Id.* (quoting *Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985)). Further, the "reasonableness" of a

15

particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight. *Id.* (citing *Terry v. Ohio,* 392 U.S. 1,

20–22 (1968).)  With respect to a claim of excessive force, the same standard of

reasonableness at the moment applies:

> "Not every push or shove, even if it may later seem unnecessary in the peace
> of a judge's chambers," *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973),
> violates the Fourth Amendment. The calculus of reasonableness must embody
> allowance for the fact that police officers are often forced to make split-second
> judgments—in circumstances that are tense, uncertain, and rapidly evolving—
> about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness"
> inquiry in an excessive force case is an objective one: the question is whether
> the officers' actions are "objectively reasonable" in light of the facts and
> circumstances confronting them, without regard to their underlying intent or
> motivation. *See Scott* [*v. United States,* 436 U.S. 128, 137–139 (1978)]; *see
> also Terry v. Ohio,* [392 U.S. at 21] (in analyzing the reasonableness of a
> particular search or seizure, "it is imperative that the facts be judged against an
> objective standard"). An officer's evil intentions will not make a Fourth
> Amendment violation out of an objectively reasonable use of force; nor will an
> officer's good intentions make an objectively unreasonable use of force
> constitutional. *See Scott v. United States, supra,* 436 U.S. at 138.

*Graham,* 490 U.S. at 396-97.

In addition to the three factors identified in *Graham,* i.e., the severity of the crime at

issue, whether the suspect poses an immediate threat, and whether he is actively resisting

arrest or attempting to evade arrest by flight, 490 U.S. at 396, the Third Circuit Court of

Appeals added that other relevant factors include

> the possibility that the persons subject to the police action are
> themselves violent or dangerous, the duration of the action, whether the

action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997) *abrogated on other grounds in Stetser v. Jinks,* 572 F. App'x 85 (3d Cir. 2014).  In considering whether the force used by a defendant in a specific case was objectively reasonable under the circumstances, it is well settled that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic,* 365 F.3d 181, 198 (3d Cir. 2004); *accord Abraham v. Raso,* 183 F.3d 279, 290 (3d Cir. 1999) ("[R]easonableness under the Fourth Amendment should frequently remain a question for the jury.").

A panel of the Third Circuit Court of Appeals considered the use of a police dog in *Moore v. Vangelo,* 222 F. App'x 167 (3d Cir. 2007).

> Use of a police dog to bite and hold a suspect is not per se unreasonable. *See Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994) (holding that "the deputies' use of the police dog is subject to excessive force analysis"); *Chew v. Gates,* 27 F.3d 1432, 1447 (9th Cir.1994) (stating that, even though the case must go to the jury to determine if the use of a dog was reasonable, "[n]o decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful"); *see also Jarrett v. Town of Yarmouth,* 331 F.3d 140, 150 (1st Cir.2003) ("We are aware of no post-*Chew* decisions suggesting that bite-and-hold policies are unconstitutional per se."). Although it is true that "injuries are not unusual[,] police dogs can—and often do—cause serious harm," *Vera Cruz v. City of Escondido,* 139 F.3d 659, 661 (9th Cir.1997), the use of K–9 force to apprehend suspects where the *Graham* factors weigh in favor of the police is reasonable.

222 F. App'x at 170–71.

The Third Circuit panel affirmed the district court's grant of summary judgment, finding that the *Graham* factors weighed in favor of the defendant police officer who "was confronted with a dangerous situation where the safety of officers and others was at risk. The melee going on before him was an ongoing assault. Three people were involved in the fight and [the police officer] was, at least temporarily, alone." *Id.* at 171.

Here, Defendant Homza cites Plaintiffs' Second Amended Complaint generally in support of his assertions that Plaintiff Fought "continually resisted arrest and repeatedly ignored [his] orders to cease, prompting [him] to engage his K-9 partner," and "[a]t no time did [he] direct his K-9 partner to apply force in an unreasonable or excessive manner." (Doc. 44 at 15 (citing Doc. 36 *generally*).)  The Court concludes that Defendant's conclusory statements are inadequate to satisfy his burden of showing that Plaintiff Fought has not stated a plausible claim for relief under the Fourth Amendment.

Considering the relevant *Graham* and *Sharrar* factors, *see supra* pp. 15-16, nothing in the Second Amended Complaint suggests that Plaintiff Fought was suspected of any serious crime in that he was eventually charged with Resisting Arrest, Disorderly Conduct, and Public Drunkenness.[2] (Doc. 36 ¶ 45.)  Regarding whether Plaintiff Fought posed an

---

[2] As set out in the Background section of this Memorandum Opinion, on October 5, 2017, Plaintiff Fought appeared before the Honorable Thomas F. Malloy, Sr. for a preliminary hearing and all criminal charges against him were dismissed.  (Doc. 36 ¶ 15.)  On October 10, 2017, Defendant Homza re-filed the criminal charges against Plaintiff.  (*Id.* ¶ 17.)  On January 11, 2018, a preliminary hearing was conducted-- the charge of public drunkenness was dismissed for lack of evidence, and the charges of resisting arrest

immediate threat and whether he actively resisted arrest, only Defendant Homza's

conclusory statement that Plaintiff Fought "continually resisted arrest and repeatedly

ignored orders to cease" (Doc. 44 at 15) suggests the applicability of these factors--

Defendant Homza does not assert that Plaintiff Fought attempted to evade arrest by flight.

*See Graham*, 490 U.S. at 396.  Notably, Defendant Homza does not say to what conduct

his orders to cease were directed.  Nothing in the record supports a suggestion that Plaintiff

Fought was violent or dangerous, that it was a lengthy altercation between Plaintiff Fought

and Defendant Homza, that Defendant Homza believed Plaintiff Fought to be armed, or that

the number of persons with whom Defendant Homza had to contend played a role in his

actions.  *See Sharrar*, 128 F.3d at 822.  Even had Defendant Homza made these

assertions, they could not serve as a basis for dismissal of Plaintiffs' Second Amended

Complaint at the pleading stage under the *Twombly-Iqbal* standard for determining the

sufficiency of Plaintiffs' pleading.

While the use of a dog to effectuate an arrest is not *per se* unreasonable, *Moore*,

222 F. App'x at 170–71, crediting Plaintiff Fought's assertions regarding the circumstances

of his seizure, he presents a plausible claim that Defendant Homza's use of the dog was

---

and disorderly conduct were held for trial. (*Id.* ¶ 18.)  On June 12, 2018, a criminal jury trial commenced on the charges of resisting arrest and disorderly conduct.  (*Id.* ¶ 19.)  On June 14, 2018, Plaintiff Fought's Motion for Judgment for Acquittal was granted by the trial court for the charge of disorderly conduct charge at the close of the Commonwealth's case.  (*Id.* ¶ 20.)  On June 14, 2018, Plaintiff Fought was found not guilty of resisting arrest by a jury of his peers.  (*Id.* ¶ 21.)

excessive, i.e., Defendant Homza's engagement of Chase in the manner and for the

duration alleged was more force than was reasonably necessary.  As set out above, *see*

*supra* pp. 3-4, the Second Amended Complaint specifically alleges that Defendant Homza,

without warning, moved to take Plaintiff Fought into custody by pinning him to the ground.

(Doc. 36 ¶ 33.)   He approached Plaintiff Fought from behind while Plaintiff was in a

kneeling position and used an "arm bar" hold, placing a handcuff on one wrist and using his

body weight to force Plaintiff to the ground face-first.  (*Id.* ¶ 35.)  He handcuffed one of

Plaintiff Fought's hands and held onto the handcuffs, placing Plaintiff Fought under his

physical control.  (*Id.* ¶¶ 36, 37.)  Defendant Homza's K-9 partner then latched onto the right

side of Plaintiff Fought's back.  (*Id.* ¶ 37.)  Defendant Homza then stood by and watched as

the dog mauled Plaintiff Fought's back while Plaintiff Fought remained handcuffed and

tethered to Defendant Homza.  (*Id.* ¶ 38.)  The dog alternated between jumping up and

down with Plaintiff Fought's back firmly within his jaws and chewing on Plaintiff Fought's

back from a stationary position while Defendant Homza and several civilians stood by

watching.  (*Id.* ¶ 39.)  Plaintiff had no means of escaping the dog's attack.  (*Id.* ¶ 40.)

Defendant Homza ultimately issued the release command and the dog immediately stopped

engaging with Plaintiff Fought and retreated to Defendant Homza's side.  (*Id.* ¶ 44.)  The

cell-phone video taken by civilian bystanders depicts Plaintiff Fought on the ground,

unarmed and without any active resistance, with Defendant Homza standing over Plaintiff

Fought and watching as the K-9 chewed on Plaintiff Fought's back.  (*Id.* ¶¶ 45, 46.)

Defendant Homza's conclusory assertions regarding the circumstances of his seizure of Plaintiff Fought stand in stark contrast to the detailed allegations contained in the Second Amended Complaint.  Taking the factual allegations as true, as the Court must at this stage of the proceedings, *see supra* pp. 10-11, Defendant's assertions provide no basis to dismiss Count I.[3]  Therefore, Defendants' motion as to Count I will be denied and Plaintiff Fought's § 1983 Fourth Amendment excessive force claim goes forward.

## B.  Count II – Failure to Properly Train and Supervise

In Count II of Plaintiffs' Second Amended Complaint, Plaintiff Fought alleges that pursuant to 42 U.S.C. § 1983, Defendant City of Wilkes-Barre failed to properly train and supervise Defendant Homza.  (Doc. 36 at 24.)   Plaintiff Fought contends that he has sufficiently pled both claims.  (Doc. 55 at 13-14.)  For the reasons discussed below, the Court concludes that Defendant City has not satisfied its burden of showing it is entitled to dismissal of Count II.

---

[3] In the reply brief, Defendant Homza takes issue with what he views as Plaintiff Fought's inconsistent recitation of alleged facts.  (Doc. 56 at 2.)  He points to the Second Amended Complaint's assertion that Defendant Homza directed his K-9 partner to lay down and stood by and watched as the dog mauled Plaintiff Fought's back where the opposition brief states that Defendant Homza directed the dog to maul Plaintiff's back.  (*Id.* (*comparing* Doc. 36 ¶ 31 *with* Doc. 55 at 18).)  In considering whether Plaintiffs' Second Amended Complaint states a plausible excessive force claim, the Court relies only those facts contained in the Second Amended Complaint.  Further, the Court recognizes a distinction between the assertions in the Second Amended Complaint and the opposition brief but finds perplexing Defendant Homza's assertion that this discrepancy casts doubt on the acceptance of Plaintiff's well-pleaded facts as true (Doc. 56 at 2): Defendant Homza himself asserts in the supporting brief that he was "***prompt[ed] to engage*** his K-9 partner" (Doc. 44 at 15 (emphasis added)), and any implication that it was not excessive force because he "stood by and watched" his dog maul Plaintiff Fought rather than issued a direct order to do so is disingenuous at best.

In *Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575 (3d Cir. 2003), the

Court of Appeals for the Third Circuit discussed when an individual state actor's actions can

be attributed to a governing authority or municipality who employs the individual.  The

Circuit Court first noted that the employer "cannot be held responsible for the acts of its

employees under a theory of *respondeat superior* or vicarious liability. *Id.* at 583 (citing

*Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  For the employer

to be liable, the plaintiff must provide evidence that there was a relevant policy or custom of

the defendant, and that the policy caused the constitutional violation they allege.  *Id.* at 583-

84 (citing *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404

(1997)).  *Natale* then explained the established tenet that not all state action rises to the

level of a custom or policy:

> A policy is made "when a decisionmaker possess[ing] final authority to establish
> municipal policy with respect to the action issues a final proclamation, policy or
> edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur
> v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)
> (plurality opinion)). A custom is an act "that has not been formally approved by
> an appropriate decisionmaker," but that is "so widespread as to have the force
> of law." *Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382.
>
> There are three situations where acts of a government employee may
> be deemed to be the result of a policy or custom of the governmental entity for
> whom the employee works, thereby rendering the entity liable under § 1983.
> The first is where "the appropriate officer or entity promulgates a generally
> applicable statement of policy and the subsequent act complained of is simply
> an implementation of that policy." [Bd. Of Comm'rs of *Bryan County, Oklahoma
> v. Brown,* 520 U.S. 397,] 417 (1997) (Souter, J., dissenting). The second
> occurs where "no rule has been announced as policy but federal law has been
> violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may

also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' " *Id.* at 417–18, 117 S.Ct. 1382 (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Berg [v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir. 2000)] (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale,* 318 F.3d at 584.  Even without evidence that the government entity had an affirmative policy or custom on the matter at issue, evidence that the government entity "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights" would suffice.  *Id.*

With this general background on municipal liability, the Court will now turn to the specific failure to train and supervise claims raised in Count II against Defendant City.  The parties address each claim separately and the Court will do likewise.

## 1. Failure to Train

Defendant City asserts that Plaintiff Fought presents only broad and factually unsupported generalized allegations in support of his claim that Defendant City failed to properly train Defendant Homza and he has not presented the requisite evidence to state a claim for relief based on Defendant City's failure to train.  (Doc. 44 at 17-18.)  Plaintiff Fought responds that Defendant City's argument that the specific training that is lacking has

yet to be identified is premature and more suitable for a motion for summary judgment.
(Doc. 55 at 13.)  The Court agrees.

"[A] municipality's failure to properly train its employees and officers can create an
actionable violation . . . under § 1983." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir.
1997); *see also Estate of Roman*, 914 F.3d at 798 (citing Reitz, 125 F.3d at 145).  The
Supreme Court considered the contours of a municipality's liability under this theory in *City
of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).  The Court held that "the inadequacy of
police training may serve as the basis for § 1983 liability only where the failure to train
amounts to deliberate indifference to the rights of persons with whom the police come into
contact." *Id.* at 388.  *City of Canton* explained that

> this rule is most consistent with our admonition in *Monell,* 436 U.S., at 694, 98
> S.Ct., at 2037, and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445,
> 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under § 1983 only
> where its policies are the "moving force [behind] the constitutional violation."
> Only where a municipality's failure to train its employees in a relevant respect
> evidences a "deliberate indifference" to the rights of its inhabitants can such a
> shortcoming be properly thought of as a city "policy or custom" that is actionable
> under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati,* 475
> U.S. 469, 483–484, 106 S.Ct. 1292, 1300–1301, 89 L.Ed.2d 452 (1986)
> (plurality) put it: "[M]unicipal liability under § 1983 attaches where—and only
> where—a deliberate choice to follow a course of action is made from among
> various alternatives" by city policymakers. See also *Oklahoma City v.
> Tuttle,* 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only
> where a failure to train reflects a "deliberate" or "conscious" choice by a
> municipality—a "policy" as defined by our prior cases—can a city be liable for
> such a failure under § 1983.
>
> *Monell's* rule that a city is not liable under § 1983 unless a municipal
> policy causes a constitutional deprivation will not be satisfied by merely alleging

that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 388–90.  The Court of Appeals for the Third Circuit has noted

that, in some instances, ""the need for training can be said to be so obvious, that failure to

do so could properly be characterized as deliberate indifference to constitutional rights even

without a pattern of constitutional violations."  *Thomas v. Cumberland Cty.*, 749 F.3d 217,

223 (3d Cir. 2014) (citing *City of Canton,* 489 U.S. at 390 n.10).

In *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999), the Circuit Court

considered a § 1983 failure to train claim in the context of a motion to dismiss, focusing on

*City of Canton's* deliberate indifference requirement and considering guidance from other

courts, including the Second Circuit's discussion of the issue in *Walker v. City of New York*,

974 F.2d at 293 (2d Cir. 1992).  *Carter* discussed the three-part test formulated in *Walker*:

in order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult

choice or a history of employees mishandling; and (3) the wrong choice by an
employee will frequently cause deprivation of constitutional rights.

*Carter*, 181 F.3d at 357 (citing *Walker,* 974 F.2d at 297–98).

Here Defendant City specifically contends that Plaintiff Fought's

broad and factually unsupported generalized allegations regarding Officer
Homza's training . . . lack any supporting evidence that the City was the "moving
force" behind Mr. Fought's injury, which is necessary to prove the existence of
deliberate indifference, and is required to sustain a claim for relief based on a
failure to train.

(Doc. 44 at 17 (citing *City of Canton*, 520 U.S. at 391; Doc. 36, *generally*).  Defendant City

further maintains that Plaintiff Fought has not identified the specific training the City should

have offered nor has he established that such training was not provided, and he presented

no evidence that similar conduct occurred in the past or that the incident occurred as a

result of insufficient training rather than personal animus.  (*Id.*)

The Court concludes that the Second Amended Complaint states a plausible § 1983

claim that Defendant City failed to adequately train Defendant Homza.  In making this

determination, the Court notes that, in most instances, the standards recited by Defendant

City indicate what a plaintiff must *ultimately* show to prevail on a § 1983 failure to train

claim, they do not provide the accurate standard for consideration of such a claim at the

motion to dismiss stage.  (*See* Doc. 44 at 15-18 (citing, *inter alia*, *City of Canton*, 489 U.S.

378; *Reitz,* 125 F.3d 139).)  The appropriate standard is that found in *Carter* where the

Circuit Court identified the three-part test set out above.

Here there is no doubt that municipal policymakers knew that employees would confront the particular situation. *Carter*, 181 F.3d at 357. Wilkes-Barre City Police Department Special Order 1.3.9, attached as Exhibit A to Plaintiffs' Second Amended Complaint (Doc. 36-1), was implemented on April 23, 2014, "to provide guidelines for the operation, training, certification and development of the canine unit." (Doc. 36-1 at 2.) The "Policy" section of the Special Order states as follows:

> Utilization of canines requires adherence to procedures that properly control their unique abilities and channel these abilities into legally acceptable law enforcement activities. The Chief of Police and the City Solicitor shall review all rules, regulations, policies, and procedures relating to K-9 operations and make changes necessary for compliance with existing criminal and civil liability law.

(Doc. 36-1 at 2.) This policy statement shows that municipal policymakers, the Chief of Police and City Solicitor, knew that K-9 operations would confront situations which required special procedures and controls. The "Training and Certification," "Officer Requirements," and "Operational Procedures" sections of the Special Order exemplify appreciation of the difficult situations a K-9 unit may face and the need for rigorous standards and training. (*See* Doc. 36-1 at 6-8, Ex. A, Special Order 1.3.9 (H), (I), (K).) Thus, the first *Carter* element is satisfied.

The extensive guidance provided in Special Order 1.3.9 implies that a handler will be faced with difficult choices when his K-9 team is activated. *See Carter*, 181 F.3d at 357. Common sense and general search and seizure principles support this conclusion. As the

27

Supreme Court stated in *Graham v. Connor*, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  490 U.S. at 396-97.  Based on the difficult choices inherent in a K-9 handler's control of his dog, the Court finds that the second *Carter* element is satisfied.

The final question is whether Plaintiffs' Second Amended Complaint shows that "the wrong choice by an employee will frequently cause deprivation of constitutional rights." *See Carter*, 181 F.3d at 357.  As this case exemplifies and the law recognizes, a police dog can inflict severe harm.  *See, e.g., Becker v. Elfrich*, 821 F.3d 920, 925-26 (7th Cir. 2016); *Miller v. Clark Cty.*, 340 F.3d 959, 951, 964 (9th Cir. 2003); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  The inappropriate engagement of a police dog or handler's lack of control are relevant considerations in the reasonableness of a police officer's use of force. *See, e.g., Becker*, 821 F.3d at 929; *see also Maney v. Garrison*, 681 F. App'x 210, 220 (4th Cir. 2017) ("To be sure, a bite from a police canine is a significant use of force."); *Moore*, 222 F. App'x at 170-71; *Chatman v. City of Johnstown, Pa.*, 131 F. App'x 18, 20 (3d Cir. 2005); *Ricker v. Weston*, 27 F. App'x 113, 118 (3d Cir. 2002).  However, the connection between the potential seriousness of the harm which can be inflicted by a police dog and the relevant excessive force inquiry does not address the frequency aspect of the third element.  Despite a lack of argument on the frequency issue, the Court will not disallow the

claim based on this deficiency in that Defendant City does not discuss the *Carter* test or

provide any detailed argument on Plaintiff Fought's failure to train claim.          In the general

terms set out in *City of Canton*, allegations of failure to train here arguably support that the

"failure to train reflects a 'deliberate' or 'conscious' choice by a municipality" which would

allow a finding that Defendant City is liable for such a failure under § 1983, 489 U.S. at 389,

in that  allegations that members of the K-9 Unit did not receive adequate training because

of manpower issues could show a deliberate or conscious choice by the policymaker which

prevented or impeded adequate training of canine teams.  (*See* Doc. 36 ¶¶ 78-81.)

Defendant City's contention that Plaintiff Fought's claim fails because he does not

identify "the specific training the City should have offered" (Doc. 44 at 17), is a

misapprehension of the appropriate standard at this stage of the proceedings.  *Carter* stated

that "[t]he District Court's insistence that [the plaintiff] must identify a particular policy

and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly

harsh."  181 F.3d at 357-58.  The Circuit Court found that the plaintiff was "not engaged in a

mere fishing expedition" and that he reasonably surmised that the misconduct alleged

"reflects inadequate training and supervision."  *Id.* at 358.

Plaintiffs' Second Amended Complaint states that Defendant City failed "to conduct

sufficient training, monitoring or supervision of its police officers regarding the constitutional

limitations on the use of force [and failed] to conduct sufficient training, monitoring or

supervision of its police officers regarding the use of police K-9s while on duty."  (Doc. 36 ¶

183.)  Allegations include quoted statements of Paul Price, the Wilkes-Barre K-9 trainer, stating that Defendant Homza and his K-9 had failed to "make training sessions because of manpower issues" and "I can't train people that aren't there," the latter an explanation for Mr. Price's notification to City Defendant that he resigned his post.  (Doc. 36 ¶¶ 79, 80.)

As *Carter* concluded that the plaintiff "cannot be expected to know, without discovery, exactly what training policies were in place or how they were adopted," 181 F.3d at 358, here the Court concludes based on allegations contained in the Second Amended Complaint and application of relevant authority to the facts alleged and reasonable inferences drawn therefrom that Plaintiff Fought cannot be expected to know "the specific training the City should have offered" (Doc. 44 at 17) without discovery.  Thus, the relevant *Carter* factors and general considerations applicable to a motion to dismiss indicate that Plaintiff Fought has stated a plausible failure to train claim against Defendant City.

## 2.  Failure to Supervise

Defendant City states that Plaintiff Fought failed to plead facts required to survive dismissal of his failure to supervise claim.  (Doc. 44 at 19.)  Plaintiff Fought responds with numerous citations to the Second Amended Complaint and asserts that this claim should be allowed to proceed to discovery.  (Doc. 55 at 15.)  The Court concludes that Defendant City has not shown that Plaintiff Fought's failure to supervise claim should be dismissed.

In *Sample v. Diecks,* 885 F.2d 1099 (3d Cir. 1989), the Court of Appeals for the Third Circuit considered a failure to supervise claim lodged against William Robinson who, at the

relevant time, was the Commissioner of the Pennsylvania Bureau of Corrections, and

Ernest Diecks, the senior records officer at the institution where the plaintiff was detained.

The plaintiff, Joseph Sample, contended that Diecks had wrongly determined that he could

not be released on bail pending the new trial ordered by the Pennsylvania Supreme Court

because he had time to serve on another sentence. 885 F.2d at 1102.  Because of this

error, Sample was not released for more than nine months after his sentence should have

been completed.  *Id.*  In considering the plaintiff's argument that Robinson failed to enforce

the written procedures and that his failure resulted in the overstay, the Circuit Court noted

that the argument focused "not on what system Robinson established, but on the adequacy

of his supervision of the prison system."  *Id.* at 1116.  *Sample* then reasoned that

> the rubric "supervision" entails, among other things, training, defining expected
> performance by promulgating rules or otherwise, monitoring adherence to
> performance standards, and responding to unacceptable performance whether
> through individualized discipline or further rulemaking. For the purpose of
> defining the standard for liability of a supervisor under § 1983, the
> characterization of a particular aspect of supervision is unimportant.
> Supervisory liability in this context presents the question whether Robinson
> was responsible for—whether he was the "moving force [behind]," *City of
> Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)
> (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694,
> 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978))—Diecks' constitutional tort.

*Sample*, 885 F.2d at 1116–17.  Distinguishing the claim against Robinson from that

considered against a municipality in *City of Canton*, the Circuit Court stated that

> [a]lthough the issue here is one of individual liability rather than of the liability of
> a political subdivision, we are confident that . . . the standard of individual
> liability for supervisory public officials will be found to be no less stringent than

the standard of liability for the public entities that they serve. In either case, a "person" is not the "moving force [behind] the constitutional violation" of a subordinate, *City of Canton,* 109 S.Ct. at 1205, unless that "person"—whether a natural one or a municipality—has exhibited deliberate indifference to the plight of the person deprived. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988).

Based on *City of Canton,* we conclude that a judgment could not properly be entered against Robinson in this case based on supervisory liability absent an identification by Sample of a specific supervisory practice or procedure that Robinson failed to employ and specific findings by the district court that (1) the existing custom and practice without that specific practice or procedure created an unreasonable risk of prison overstays, (2) Robinson was aware that this unreasonable risk existed, (3) Robinson was indifferent to that risk, and (4) Diecks' failure to assure that Sample's complaint received meaningful consideration resulted from Robinson's failure to employ that supervisory practice or procedure.

*Sample*, 885 F.2d at 1117–18.  The Circuit Court has since set out the appropriate test as follows:

The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 317 (3d Cir. 2014), *cert. granted, judgment rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015) (citing *Sample,* 885 F.2d at 1118; *Brown v. Muhlenberg Twp.,* 269 F.3d 205 (3d Cir.2001)).

Here Plaintiff Fought relies on *Sample* in arguing that this claim should proceed to

discovery.  (Doc. 55 at 14-16.)  He asserts the following:

> Plaintiff Fought has alleged that Defendant Lendacky failed to meet the minimum requirement for assignment to the Wilkes-Barre police department canine unit established in 2014. *See* Doc. 36 ¶ 63, 66, and 68-69. Plaintiff Fought has also alleged that the failure of Defendant Lendacky to follow the minimum hiring standards established by the Wilkes-Barre police department led to the constitutional violation which led to Plaintiff Fought filing this complaint. *See* Doc. 36 ¶ 71-73. Further, Defendant Homza acknowledged his failure to complete the required hours of training once promoted to the position of canine handler. *See* Doc. 36 ¶ 78-79. The court is permitted to draw on its judicial experience and common sense to determine that Defendant Lendacky was aware of the hiring requirements at the time she selected Defendant Homza to be a canine handler, and Defendant Lendacky was at least aware of the risk of promoting an unqualified officer to the position of canine handler. It follows logically that Defendant Lendacky displayed deliberate indifference to those risks by promoting an officer who failed to meet even the first requirement for employment. *Iqubal* [sic], 129 S. Ct. at 1950. As such, this claim must advance to the discovery phase.

(Doc. 55 at 15-16.)

Defendants do not discuss Plaintiff Fought's failure to supervise claim in their reply

brief.  (*See* Doc. 56.)  The Court finds significant the allegations that Defendant Homza--an

officer appointed by Defendant Lendacky to the canine unit without the requisite

qualifications--did not complete the required training, the unit's trainer resigned because he

could not train teams who did not come to training, and Special Order 1.3.9 addresses the

need for the Police Canine Unit's adherence to procedures and specifically requires that the

Commander of Operations directly supervise the unit and send all training notices and

recommendations to the Chief of Police.  (Doc. 36 ¶¶ 63-66, 68, 78-81; Ex. A, Special Order

1.3.9(III) and (C)(1), (2).)   It is also significant that "'supervision' entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking." *Sample*, 885 F.3d at 1116.  Whether any activity considered under this rubric was the "moving force" behind Defendant Homza's conduct is ultimately the central question when considering supervisory liability under § 1983, *id.* at 1117, and it is a question that cannot be answered at the pleading stage.  The Court recognizes that the causation element of this type of claim is difficult to establish.  However, at this stage of the proceedings, the Court will not foreclose Plaintiff Fought's ability to develop the record on this issue.

The determination that the failure to supervise claim should go forward is not solely on the adequacy of Plaintiff's pleading related to the claim, but also on Defendant City's obligation to provide more than conclusory assertions in support of its requested dismissal of this claim.  Given Defendant City's sparse initial assertions in support of dismissal of the failure to supervise claims (*see* Doc. 44 at 19)[4] and subsequent failure to respond to Plaintiff

---

[4] Defendant City cites *Dotterer v. Pinto*, No. CV 13-06903, 2016 WL 336870, at *9 (E.D. Pa. Jan. 27, 2016), in support of its conclusion that Plaintiff Fought does not state a plausible failure to supervise claim.  (Doc. 44 at 18-19.) Insofar as *Dotterer* relies on Third Circuit precedent, including *Sample*, for identifying the legal framework for a failure to supervise claim, 2016 WL 336870, at *9, the Court would recognize a discussion of the identified factors if Defendant City had in fact presented such a discussion. However, it did not do so and, with its conclusory assertion that the failure to supervise claim must be dismissed with prejudice because Plaintiff Fought failed to plead facts or provide evidence in support of this claim (Doc. 44 at 18-19), Defendant City does not acknowledge the difference between what must be established to defeat a summary judgment motion, which was the procedural posture of *Dotterer*, and what is sufficient to survive a motion to dismiss.  Notably, in *Dotterer*, the district court found it significant that the

Fought's argument, the Court concludes Defendant City has not provided a legally sufficient basis upon which to dismiss Plaintiff Fought's failure to supervise claim.  Therefore, Count II goes forward in its entirety.

## C. Counts III and IV – Assault and Battery

In Count III of Plaintiffs' Second Amended Complaint, Plaintiff Fought raises a state law assault claim against Defendant Homza.  (Doc. 36 at 28.)   In Count IV, he raises a state law battery claim.  (*Id.* at 29.)  Defendant asserts that both claims fail because he used reasonable force in arresting Plaintiff Fought.  (Doc. 44 at 20, 21.)  The Court concludes Defendant Homza has not satisfied his burden of showing that these claims are properly dismissed, the Court will deny the motion as to Counts III and IV.

A police officer's liability for the torts of assault and battery was considered in *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994).

> "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Cohen v. Lit Brothers,* 166 Pa. Super. 206, 209, 70 A.2d 419, 421 (1950). (Citation omitted.) A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is

---

plaintiff did not provide evidence that supervisory defendants instructed the underling to deviate from her training.  *Dotterer,* 2016 WL 336870, at *9.  Here evidence shows there was a deviation in training procedures and the unit commander was to forward training notices to the Chief of Police.  Therefore, awareness of training deficiencies and the supervisory aspect of that failure (including alleged lack of training because of manpower issues) are arguably relevant factual matters to be developed at a later stage of the proceedings.

necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery.

. . . .

A police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive, and for false imprisonment when a jury concludes that he did not have probable cause to make an arrest. It is conceivable that a jury could find a police officer liable for those torts under circumstances which demonstrate that the officer did not intentionally use unnecessary and excessive force, or did not deliberately arrest a person knowing that he lacked probable cause to do so.

*Renk*, 641 A.2d at 293–94.

Because the Court has determined that Plaintiff Fought stated a plausible Fourth Amendment excessive force claim in Count I, *see supra*, Defendant Homza's conclusory statement that he used reasonable force in effectuating the arrest cannot serve as a basis for dismissal of Plaintiff Fought's assault and battery claims. Therefore, Defendants' motion will be denied as to these claims.

D.  Count V – Intentional Infliction of Emotional Distress

In Count V of Plaintiffs' Second Amended Complaint, Plaintiff Fought raises a state law claim against Defendant Homza for Intentional Inflcition of Emotional Distress ("IIED"). (Doc. 36 at 30.)  Both parties rely on *Kasper v. County of Bucks*, 514 F. App'x 210, 217 (3d Clr. 2017), for the proposition that, under Pennsylvania law, liability for IIED has been found "where the conduct has been so outrageous in character and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."   (Doc. 44 at 21; Doc. 55 at 17.)

Defendant asserts only that Plaintiff Fought has failed to sufficiently plead that the

"lawful actions of Officer Homza were so outrageous in character and so extreme in degree"

and that Plaintiff Fought suffered severe emotional distress as a result.  (Doc. 44 at 22.)

Plaintiff responds as follows:

> Plaintiff has sufficiently plead facts which, when construed in the light most
> favorable to Plaintiff Fought, give rise to an entitlement to relief. Specifically,
> Plaintiff Fought has alleged that Defendant Homza took physical control of
> Plaintiff Fought without warning, while Fought was not looking or expecting
> physical contact, and pinned him to the ground with his knees to Plaintiff's back.
> *See* Doc. 36, generally. Once Defendant Homza successfully pinned Plaintiff
> Fought to the ground, handcuffed and immobilized him, he then directed his
> unleashed canine to maul Plaintiff Fought's back. While this vicious attack
> persisted, Defendant Homza stood by watching and holding the handcuffed
> wrist of Plaintiff Fought while refusing to give the "release" command to his
> canine. *See* Doc. 36 ¶ 35-44. As such, it can easily be inferred that Defendant
> Homza's conduct was objectively outrageous and beyond the bounds of
> decency so as to permit Plaintiff's claims to move forward to the discovery
> phase of litigation.

(Doc. 55 at 18.)

The Court finds that the conclusory statement regarding the lawfulness of Defendant

Homza's actions is insufficient to show that he is entitled to dismissal of the IIED claim given

the allegations contained in the Second Amended Complaint concerning events which

transpired in Wilkes-Barre's Public Square on July 18, 2017, and the subsequent procedural

history of proceedings related to the event in the Court of Common Pleas in Luzerne

County.  *See supra* nn. 2, 3.  The Court has concluded that Defendant is not entitled to dismissal of Plaintiff Fought's excessive force claim which calls into question Defendant Homza's justification for allowing his dog to attack and seriously harm Plaintiff Fought. Whether Defendant Homza's actions were "lawful" under the Fourth Amendment remains at issue and this asserted basis for dismissal of the IIED claim must fail.  Therefore, Defendant Homza has not shown that he is entitled to dismissal of Plaintiff Fought's IIED claim.

## E.  Counts VI and VII – Abuse of Process and Malicious Prosecution

In Count VI of Plaintiffs' Second Amended Complaint, Plaintiff Fought raises a claim against Defendant Homza for Abuse of Process.  (Doc. 36 at 31.)   In Count VII, he raises a claim for Malicious Prosecution.  (*Id.* at 32.)   Although the Second Amended Complaint does not indicate specifically whether these are state or federal claims (*see* Doc. 36 at 31-33), in his opposition brief he cites to elements of state law claims (*see* Doc. 55 at 18, 19). Therefore, the Court will consider Counts VI and VII as state law claims.[5]

Defendant Homza maintains that Plaintiff Fought has failed to distinguish his abuse of process claim from his malicious prosecution claim and advances the same allegations in support of both claims.  (Doc. 44 at 23.)  He asserts that both claims must be dismissed with prejudice because Defendant Fought fails to allege an element necessary to each claim.

---

[5] Abuse of process and malicious prosecution claims under state and federal law are similar though not identical.  *Napier v. City of New Castle*, 407 F. App'x 578, 582 (3d Cir. 2010); *Kossler v. Crisanti*, 564 F.3d 181, 186–87 (3d Cir. 2009); *Bristow v. Clevenger*, 80 F. Supp. 2d 421, 430–31 (M.D. Pa. 2000).

The Supreme Court of Pennsylvania explained the difference between the two

causes of action, noting that

> there is often confusion in the two separate and distinct actions of malicious
> use of process and abuse of process. The distinction recognized between the
> two actions was set forth in *Publix Drug Company v. Breyer Ice Cream Co.,* 347
> Pa. 346, 32 A.2d 413 (1943). In that case we said:
>
>> The gist of an action for abuse of process is the improper use of
>> process after it has been issued, that is, a perversion of it: *Mayer
>> v. Walter,* 64 Pa. 283; Annotation, 80 A.L.R. 581. "An abuse is
>> where the party employs it for some unlawful object, not the
>> purpose which it is intended by the law to effect; in other words,
>> a perversion of it ... On the other hand, legal process, civil or
>> criminal, may be maliciously used so as to give rise to a cause
>> of action where no object is contemplated ... other than its proper
>> effect and execution": *Mayer v. Walter,* supra, p. 285; *Johnson
>> v. Land Title B. & T. Co.,* 329 Pa. 241, 241, 242, 198 A. 23.
>> Malicious use of civil process has to do with the wrongful
>> initiation of such process, while abuse of civil process is
>> concerned with a perversion of a process after it is issued.
>
> 347 Pa. at 349, 350, 32 A.2d 413.

*McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987).  It is well-recognized that claims for

abuse of process and malicious prosecution can overlap: "if a criminal prosecution 'is

wrongfully initiated and thereafter perverted, both torts lie.'"  *Occhipinti v. Bauer*, No. 3:13-

CV-1875, 2017 WL 3495182, at *11–12 (M.D. Pa. Aug. 14, 2017) (quoting *Jennings v.

Shuman*, 567 F.2d 1213, 1218 (3d Cir. 1977)).

## 1.  Abuse of Process

Defendant correctly notes that the specific allegations supporting Plaintiff Fought's claims of abuse of process and malicious prosecution are the same.  (*See* Doc. 36 ¶¶ 208-214, 216-222.)  Plaintiff Fought states that "Defendant Homza caused criminal prosecution of Plaintiff in bad faith for a purpose for which criminal prosecutions are not designed – namely, the harassment of Plaintiff" (Doc. 36 ¶¶ 211, 219).  In his opposition brief, Plaintiff states that that his abuse of process claim should go forward because

> [a] fair reading of the complaint at issue suggests that Defendant Homza continued to make false statements after the process was initiated in order to deprive Plaintiff Fought of his constitutional rights. *See* Doc. 36 ¶ 58 and Exhibit "B." Defendant Homza continued to make false statements after the initiation of the charges against Plaintiff Fought to accomplish a purpose for which the process was not designed, namely harassment of Plaintiff Fought and the justification of Defendant Homza's use of excessive force. *See* Doc. 36, ¶ 57.

(Doc. 55 at 19.)

The Court finds that Plaintiff Fought's allegation that "Defendant Homza caused criminal prosecution of Plaintiff in bad faith for a purpose for which criminal prosecutions are not designed – namely, the harassment of Plaintiff" (Doc. 36 ¶¶ 211, 219), read broadly, is not limited to the initiation of the process against Plaintiff Fought in that his allegation includes Defendant Homza's actions in the prosecution which followed the initial process. On these allegations, the Court concludes that Defendant Homza has not satisfied his burden of showing that Plaintiff does not state a plausible claim for relief on his abuse of process claim.

### 2. Malicious Prosecution

"[T]o prove a malicious prosecution claim under Pennsylvania law, a plaintiff must show that the defendant "'instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (quoting *Kelley v. Gen. Teamsters, Chauffers & Helpers, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988)).  Whether a malicious prosecution defendant had probable cause to initiate the criminal prosecution out of which the malicious prosecution claim originated depends upon whether "the defendant honestly believed that the accused committed the crime for which he was prosecuted and that belief was based on a reasonable ground of suspicion of guilt." *Neczypor v. Jacobs,* 169 A.2d 528, 531 (Pa. 1961).  Thus, there is both an objective and subjective component of the probable cause inquiry.

Defendant Homza states that Plaintiff Fought's malicious prosecution claim should be dismissed with prejudice because he does not identify what false statements Defendant Homza made and why they were false, Plaintiff Fought was disorderly when questioned by Defendant Homza, and Defendant Homza was not the one to bring the criminal proceedings.  (Doc. 44 at 24-25 (citing Doc. 36, *generally*).)  Plaintiff responds as follows: he specifically identified several knowing and false statements (Doc. 55 at 20 (citing Doc. 36 ¶¶ 54-55)); the determination of probable cause depends on disputed issues which should be decided by a jury (*id.* (citing *Bristow v. Clevenger*, 80 F. Supp. 2d 421, 434 (M.D. Pa.

2000))); and Defendant Homza initiated criminal proceedings against Plaintiff Fought which ended in Plaintiff Fought's favor (*id.* (citing Doc. 36 ¶¶ 20-21, 54-56)).  Defendant Homza does not address this claim in his reply brief.  (*See* Doc. 56.)

In the cited paragraphs in the Second Amended Complaint, it is alleged that "[t]o justify Defendant Homza's conduct, and while still hospitalized, Plaintiff Fought was formally arrested and charged with Resisting Arrest, Disorderly Conduct, and Public Drunkenness" (Doc. 36 ¶ 54) and "[i]n manufacturing the affidavit of probable cause, Defendant Homza knowingly, intentionally, negligently, maliciously and/or recklessly made false statements regarding alcohol possession and consumption against Plaintiff" (*id.* ¶ 55).  Paragraph 55 alleges with some specificity what false statements Defendant Homza made, i.e., statements about alcohol possession and consumption.  *See supra* n.2.

Plaintiff also correctly asserts that issues of fact related to probable cause should be decided by a jury.  In considering the question of whether a malicious prosecution defendant has probable cause to initiate the proceeding, Pennsylvania courts treat the existence of probable cause as a legal question for the court to decide before trial:

> There is no principle more firmly imbedded in the law than the principle that in a case of malicious prosecution, the question of want of probable cause for the criminal prosecution which gave rise to the civil action, is a question not for the jury but for the court.... It has been immemorially held that the public interest requires that the legally trained mind of the judge and not the more or less emotional minds of jurors, decide whether or not there was probable cause for the initiation of the prosecution. Jurors are likely to confuse the issue of guilt or innocence of the defendant in the criminal case out of which the civil action

> originated with the basic issue whose determination decides the civil action.
> The basic issue is the want of probable cause for the criminal prosecution.

*Simpson v. Montgomery Ward & Co.*, 46 A.2d 674, 676 (Pa. 1946).  However, "when the

probable cause determination depends upon disputed issues of fact, the trial court should

submit the factual disputes to the jury, and then make the probable cause determination

based upon the jury's findings."  *Bristow*, 80 F. Supp. 2d at 434 (citing *Simpson,* 46 A.2d at

678–79; *Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 475 (3d Cir.1973)).

Here Defendant Homza does not directly address the probable cause issue in the

malicious prosecution context.  (*See* Doc. 44 at 24-25.)  To the extent his statement that

"Mr. Fought was disorderly when questioned by Officer Homza" (*id.*) is intended to support

probable cause for Plaintiff Fought's prosecution, the conclusory assertion does not show

any insufficiency in the allegations of Plaintiffs' Second Amended Complaint.  The Court

again reminds counsel, when it should not have to do so, that before the Court is

Defendants' motion to dismiss, not a motion for summary judgment after discovery.

Finally, Defendant's assertion that Plaintiff Fought's malicious prosecution claim

should be dismissed because he was not the one who brought the criminal proceedings

(Doc. 44 at 25) does not show entitlement to dismissal of the claim.  As summarized in

*Milbourne v. Baker*, Civ. A. No. 11-CV-1866, 2012 WL 1889148 (E.D. Pa. May 23, 2012),

where federal law generally allows only a prosecutor to be sued for malicious prosecution,[6]

---

[6] *Milbourne* explained that, in a 42 U.S.C. § 1983 claim for malicious prosecution,

[u]nlike federal law, Pennsylvania does not limit malicious prosecution claims to prosecutors. . . . Rather, a plaintiff may bring a malicious prosecution claim against the police officer who arrested or cited plaintiff and referred plaintiff's case to prosecutors. *See Neczypor v. Jacobs,* 403 Pa. 303, 169 A.2d 528 (Pa.1961) (affirming jury verdict in favor of plaintiff for claim of malicious prosecution against police officer who arrested plaintiff); *La Frankie v. Miklich,* 152 Pa.Cmwlth. 163, 618 A.2d 1145 (Pa.Cmwlth.Ct.1992) ("[Plaintiff's] cause of action [for malicious prosecution] was complete by alleging his arrest by [defendant, a police officer,] without probable cause."). As the Restatement (Second) of Torts explains, "criminal proceedings [for the purpose of a malicious prosecution claim] may be instituted by lawful and valid arrest of the accused on a criminal charge." § 654 cmt. e; *see also Bradley v. Gen. Acc. Ins. Co.,* 778 A.2d 707, 710–11 (Pa.Super.Ct.2001) ("The law in Pennsylvania on malicious prosecution has developed to a large extent based upon the Restatement (Second) of Torts.").

*Milbourne,* 2012 WL 1889148, at *12.

---

"[i]In most cases, 'a prosecutor rather than a police officer initiates a criminal prosecution.'" *Zeglen v. Miller,* No. 04–1940, 2008 WL 696940, at *8 (M.D. Pa. Mar.12, 2008) (quoting *Houston v. City of Phila.,* No. 05–cv–372, 2007 U.S. Dist. LEXIS 40026, at *20 (E.D. Pa. May 31, 2001)); *see also Albright v. Oliver,* 510 U.S. 266, 279 n. 5, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) ("The principal player in carrying out a prosecution ... is not police officer but prosecutor."); *Harris v. City of Phila.,* No. 97–3666, 1998 WL 481061, at *5 (E.D.Pa. Aug.14, 1998) ("In most circumstances, a plaintiff can not proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual."); *Merrero v. Micewski,* No. 96–8534, 1998 WL 414724, at *15 (E.D.Pa. July 22, 1998). A plaintiff can proceed against a police officer for malicious prosecution only if the officer " 'fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.' " *Zeglen,* 2008 WL 696940, at *8 (quoting *Telepo v. Palmer Twp.,* 40 F.Supp.2d 596, 610 (E.D.Pa.19

*Milbourne,* 2012 WL 1889148, at *11.

Because Defendant Homza was the police officer who arrested Plaintiff Fought, Defendant Homza's assertion that he did not initiate criminal proceedings does not support his conclusion that the malicious prosecution claim should be dismissed with prejudice. Further, because each of Defendant Homza's proffered reasons for dismissal are insufficient to satisfy his burden at this stage of the proceedings, the Court will deny Defendants' motion as to Count VII.

## F.  Count VIII - Negligence

In Count VIII, Plaintiffs Fought and A. Falcone raise a claim for Negligence against Defendants Homza and Lendacky.  (Doc. 36 at 33.)  Defendants contend that this claim should be dismissed with prejudice because Plaintiffs cannot satisfy the breach and causation elements of a negligence cause of action.  (Doc. 44 at 26-28.)   Plaintiffs respond that they have sufficiently pled "the requisite facts to advance their negligence claims to the discovery phase of litigation."  (Doc. 55 at 21.)  The Court concludes that Defendants have not satisfied their burden of showing that Plaintiffs have not pled a plausible negligence claim.

A plaintiff may pursue a negligence action against a defendant on the theory of direct liability or vicarious liability. Under a direct liability theory, a plaintiff "seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff."  *Scampone v. Highland Park Care Ctr., LLC.,* d57 A.3d 582, 597 (Pa. 2012). Under Pennsylvania law, in order to state a cause of action for negligence, "a plaintiff must

allege facts which prove the breach of a legally recognized duty or obligation of the defendant that is causally related to actual damages suffered by the plaintiff." *Scampone v. Highland Park Care Ctr., LLC.,* 57 A.3d 582, 596 (Pa. 2012). To prove the elements of a duty and the breach thereof, a plaintiff must show that the defendant's act or omission fell below the standard of care, and, therefore, increased the risk of harm to the plaintiff. *Id.* "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 552, 756 A.2d 1166, 1168 (2000) (citing *Gibbs v. Ernst,* 538 Pa. 193, 210, 647 A.2d 882, 890 (1994). "The existence of a duty is a question of law for the court to decide." *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005) (citations omitted).

> Duty, in any given situation, is predicated upon the relationship existing between the parties at the relevant time. . . . Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions. The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case.
>
> Only when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff. . . . Whether a duty exists is ultimately a question of fairness. The inquiry involves weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. A duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others.

*Roche v. Ugly Duckling Car Sales, Inc.,* 879 A.2d 785, 789–90 (2005) (internal quotations and citations omitted).

The Pennsylvania Commonwealth Court has noted that "[t]o maintain a negligence action against a local agency or its employees, the plaintiff must establish a common law, or statutory, cause of action against the city or employee." *Murphy v. City of Duquesne*, 898 A.2d 676, 679 (Pa. Commw. Ct. 2006). The Commonwealth Court has also explained duties owed by a police officer under Pennsylvania law:

> [i]n general, the police have a common law duty to protect the public when carrying out their duties, and the failure to act generally is not considered a harm to an individual. *Peak v. Petrovitch,* 161 Pa. Cmwlth. 261, 636 A.2d 1248 (1994). The police only have a duty to an individual if they enter into a special relationship with that individual. In order to prove a special relationship, a party must establish that the governmental entity was aware of the individual's situation or unique status, had knowledge of the potential for the harm the individual suffered, and voluntarily assumed, because of this knowledge, to protect the individual from the harm which occurred. *Id.*

*Daubenspeck v. Com.*, 894 A.2d 867, 871 (Pa. Commw. Ct. 2006); *see also Lindstrom v. City of Corry*, 763 A.2d 394 (Pa. 2000) (setting out public policy considerations relevant to police officer's common law duty to fleeing driver).

In *Agresta v. Gillespie*, 631 A.2d 772, 778 (Pa. Commw. Ct. 1993), the Pennsylvania Commonwealth Court recognized an earlier finding by the Pennsylvania Superior Court that "the police had the duty to carry out arrests in a non-negligent manner . . . [and] a police officer owed a duty of reasonable care toward a suspect in making an arrest." *Agresta,* 631 A.2d at 778, *overruled in unrelated part by City of Phila. Police Dep't v. Gray,* 633 A.2d 1090 (Pa.1993) (citing *Everette v. City of New Kensington,* 396 A.2d 467, 468, 473 (Pa. Super. Ct. 1978)).

*1. Defendant Homza*

### a. Plaintiff Fought

Here Defendant Homza acknowledges that he owed Plaintiff Fought a duty to exercise reasonable care in arresting him.  (Doc. 44 at 26.)  In asserting that the force he used in effectuating the arrest was reasonable, he implies that he did not breach the duty he owed to Plaintiff Fought.  (*See id.*)   However, the Court's determination that the question of the reasonableness of the force used cannot be decided at this stage of the proceedings, *see supra*, precludes a determination at this time under the negligence claim that Defendant Homza did not breach his duty of care to Plaintiff Fought.  Defendant's argument that Plaintiff cannot show that Defendant Homza's actions were the cause-in-fact is similarly unavailing in that Defendant Homza conclusorily asserts that it was Plaintiff Fought's "own resistance and combative behavior that caused his injuries, as Officer Homza had to engage his K-9 partner to gain control of Mr. Fought," an assertion which is not consistent with the facts pled in the Second Amended Complaint.  Once again, Defendants forget that they are attempting to dismiss Plaintiffs' Second Amended Complaint under the Federal Rule of Civil Procedure 12(b)(6) standard which is limited to a determination of whether Plaintiffs have plausibly pled their respective causes of action.

### b. Plaintiff A. Falcone

Defendant Homza also states that he is not liable for Plaintiff A. Falcone's injuries, asserting that he was a fellow police officer working with Defendant Homza the night he was

injured and assumed the risk of being injured while attempting to apprehend a suspect. (Doc. 44 at 26-27 (citing *Staub v. Toy Factory*, 749 A.2d 522, 526 (3d Cir. 2000).) Alternatively, Defendant Homza contends that, even if he owed Plaintiff A. Falcone a reasonable duty of care, the injuries he sustained were not caused by a breach of the duty. (Doc. 44 at 27.)

Defendant's conclusory statement regarding assumption of the risk does not show entitlement to dismissal of Plaintiff A. Falcone's negligence claim against Defendant Homza. The Court's determination that a single, simple statement that a plaintiff assumed the risk of harm at issue is insufficient is highlighted by the detailed analysis involved in considering application of the assumption of risk doctrine to specific circumstances under Pennsylvania law.

The Pennsylvania Superior Court explained the viability of the doctrine and complexity of the analysis in *McGarry v. Philly Rock Corp.*, No. 3326 EDA 2014, 2015 WL 6069231 (Pa. Super. Ct. Oct. 15, 2015):

> "Assumption of risk is a judicially created rule [based in the common law that] did not protect [individuals] from the consequences of their own behavior.... The doctrine, however, has fallen into disfavor, as evidenced by our [S]upreme [C]ourt's two ... attempts to abolish or limit it." *Staub v. Toy Factory, Inc.*, 749 A.2d 522, 528 (Pa.Super.2000) (en banc). Our Supreme Court has noted that "the complexity of analysis in assumption of risk cases makes it extremely difficult to instruct juries." *Howell v. Clyde,* 620 A.2d 1107, 1108 (Pa.1993) (plurality). Courts also have questioned whether the doctrine serves a purpose following Pennsylvania's adoption of comparative negligence. *See id.* at 1109; *Bullman v. Giuntoli,* 761 A.2d 566, 570 (Pa.Super.2000); *Staub,* 749 A.2d at 528; *see also Zeldman v.*

*Fisher*, 980 A.2d 637, 640 (Pa.Super.2009) ("We acknowledge the continuing vitality of the assumption of risk doctrine remains in doubt."). However, despite its difficulties, the doctrine remains the law of Pennsylvania. *See Bullman,* 761 A.2d at 570 ("[A]s the doctrine has not been formally abolished by our Supreme Court, we are obligated to apply the doctrine despite its less than wholehearted support."); *Staub,* 749 A.2d at 528 ("[U]ntil our [S]upreme [C]ourt or our legislature abrogates assumption of risk in negligence cases, the doctrine remains viable...."). . . .

> The doctrine has been defined as follows:
>
> > [A]ssumption of risk is established as a matter of law only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition. Voluntariness is established only when the circumstances manifest a willingness to accept the risk. Mere contributory negligence does not establish assumption of risk. Rather, a plaintiff has assumed the risk where he has gone so far as to abandon his right to complain and has absolved the defendant from taking any responsibility for the plaintiff's injuries. In order to prevail on assumption of risk, the defendant must establish both the "awareness of the risk" prong and the "voluntariness" prong.
>
> *Staub,* 749 A.2d at 529 (citations and quotation marks omitted).

*McGarry*, 2015 WL 6069231, at *5 (Pa. Super. Ct. Oct. 15, 2015). *McGarry* added that "[t]he risk that is appreciated and accepted must also be "the specific risk that occasioned injury.'" *Id.* at *6 (quoting *Bullman,* 761 A.2d at 571).

Notably, *Staub* and subsequent Superior Court cases relying on *Staub,* have looked to the comment to the Restatement (Second) of Torts discussing Implied Assumption of Risk: "Since interpretation of conduct is seldom so clearly indicated that reasonable men could not differ as to the conclusion, it is ordinarily a question for the jury whether what the

plaintiff has done is a manifestation of willingness to accept the risk," Restatement (Second) of Torts § 496C cmt. h (1965); *see Staub*, 749 A.2d at 530; *Murray v. Tripodi*, No. 98 EDA 2017, 2018 WL 3423685, at *4 (Pa. Super. Ct. July 16, 2018); *Beam v. Thiele Mfg., LLC*, No. 1374 WDA 2016, 2018 WL 2049135, at *9 (Pa. Super. Ct. May 2, 2018).

Regarding assumption of the risk, Defendant Homza states that "Mr. Falcone voluntarily assumed the risk when he became a police officer that injures [sic] could occur while attempting to apprehend a suspect." (Doc. 44 at 26 (citing *Staub*, 749 A.2d at 526).) He provides no additional analysis of the doctrine or its application to the facts of this case. Given the detailed legal analysis required in consideration of a defendant's assertion of the assumption of risk defense, Defendant Homza has not shown that the doctrine applies here.

Defendant Homza alternatively asserts that Plaintiff Falcone's injuries were not caused by a breach of any duty he may have owed because it was reasonable for Defendant Homza to engage his dog to attempt to retrieve the suspect and the injuries were caused by the suspect's resistance rather than by Defendant Homza's actions. (Doc. 44 at 27.) The Court concludes that Defendant Homza's simplistic recitation does not reflect Plaintiff A. Falcone's allegations regarding the series of events related to his encounter with Defendant Homza's K-9 partner. (*See* Doc. 36 ¶¶ 119-134.) Because those allegations include improper release of the dog by Officer Homza (*id.* ¶¶ 123-124) and improper supervision of the released dog (*id.* ¶¶ 132-134, 138), Defendant Homza's assertion that Plaintiff A. Falcone cannot establish the causation element of his negligence claim is

entirely inappropriate as a means to support a motion to dismiss.  Therefore, Plaintiff A.

Falcone's negligence claim against Defendant Homza will not be dismissed.

## 2.  Defendant Lendacky

Defendant Lendacky seeks dismissal of negligence claims against her based on lack

of support for Plaintiffs' allegation that she "breached a duty of care that she owed to

citizens of the City by 'supporting, condoning, and encouraging the unlawful conduct of

Defendant Homza and his K-9.'"  (Doc. 44 at 27 (citing Doc. 36 ¶ 226).)   Defendants'

supporting brief asserts that the Second Amended Complaint "is devoid of any proof

demonstrating that Officer Homza and his K-9 partner committed any unlawful conduct and,

furthermore, that former Chief Lendacky supported, condoned or encouraged such alleged

conduct that caused Mr. Fought and Mr. Falcone's injuries."  (Doc. 44 at 27-28.)

First, the Court notes that a complaint is not required to show "proof"—it is required

to set out factual allegations sufficient to show plausibility for a claim asserted.  *Iqbal*, 556

U.S. at 678; *Twombly*, 550 U.S. at 570.  To the extent Defendant's statement is taken to

mean that the Second Amended Complaint does not allege unlawful conduct by Defendant

Homza, the detailed factual background and analysis set out above regarding various

allegations contained in the pleading indicates otherwise.  These allegations are

incorporated into Plaintiffs' negligence claim.  (Doc. 36 ¶ 223.)  Similarly, factual averments

contained in the Second Amended Complaint also allege that Defendant Lendacky knew of

the K-9 team's failure to meet training requirements, and she did not impose any discipline

or corrective action after the incident with Plaintiff Fought.  (*See* Doc. 36 ¶¶ 61, 89-90, 141-144.)  Such allegations, taken to be true, support the reasonable inference that Defendant Lendacky condoned the actions of Defendant Homza's K-9 team.  This inference is bolstered by the allegation as to Defendant Lendacky's reported statement to the media, after the incident with Plaintiff Fought, that the K-9 team did as they were trained.  (*Id.* ¶ 74.)  On these allegations, Defendant Lendacky is not entitled to dismissal of the negligence claims against her in Count VIII.

## G.  Loss of Consortium

In Count IX, Plaintiff K. Falcone raises a claim for Loss of Consortium against Defendants Homza and Lendacky.  (Doc. 36 at 34.)  Defendants contend that this claim should be dismissed with prejudice because the claim is dependent on the success of her husband's claim and his claims fail as a matter of law.  (Doc. 44 at 28.)   Because the Court found in the preceding section of this Memorandum Opinion that Plaintiff A. Falcone's negligence claim goes forward, Defendants' argument for dismissal of Count IX is without foundation.  Therefore, their motion is properly denied as to Plaintiff K. Falcone's loss of consortium claim.

## H.  Count X – 42 U.S.C. § 1983 State-Created-Danger

In Count X, Plaintiffs Fought and A. Falcone assert a claim under a state-created-danger theory against Defendant Lendacky.  (Doc. 36 at 35.)  Defendant asserts that this claim must be dismissed with prejudice because Plaintiffs do not provide factual support for

their claim and the theory is inapplicable to law enforcement personnel who are injured during the course of their employment.  (Doc 44 at 29-30.)  Plaintiffs maintain that this claim should go forward because they have pled facts which satisfy each prong of the relevant inquiry.  (Doc. 55 at 24-25.)  The Court finds that Defendant Lendacky is not entitled to dismissal of this claim.

"'[T]he due process clause does not impose an affirmative obligation on the state to protect its citizens,' [but] there is an exception to this general rule that nevertheless holds an officer liable if his conduct exposes an individual to a 'state-created-danger.'"  *Kedra v. Schroeter*, 876 F.3d 424, 436 (3d Cir. 2017) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008)).  A state-created-danger claim requires proof of four elements:

> (1) the harm caused was foreseeable and fairly direct; (2) the state official "acted with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had a relationship such that "the plaintiff was a foreseeable victim of the defendant's acts"; and (4) the official affirmatively used his authority "in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger" than had he never acted.

*Kedra*, 876 F.3d at 436 (citing *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

Defendant focuses on the second and fourth elements and states that the bare assertions in the Second Amended Complaint do not satisfy the requisite standard.  (Doc. 44 at 29-31.)  Defendant also asserts that Plaintiff A. Falcone's state-created-danger claim

is specifically precluded by this Court's decision in *Pahler v. City of Wilkes-Barre*, 207 F.

Supp. 2d 341, 351 (M.D. Pa. 2001), *aff'd*, 31 F. App'x 69 (3d Cir. 2002).

As to the argument that *Pahler* precludes a state-created-danger claim by Plaintiff A.

Falcone, the Court concludes that the Court of Appeals for the Third Circuit has not

precluded such a claim.  Although *Pahler* found that "the 'state created danger' theory,

arising out of the substantive due process clause of the Fourteenth Amendment, is

inapplicable to law enforcement personnel who are injured during the course of their

employment, 207 F. Supp. 2d at 351 (M.D. Pa. 2001), *Kedra* rejected a defendant's

argument that the theory could not apply to a police officer injured by another officer in the

course of weapons training.  The Circuit Court stated that it was unconvinced by the

defendant's argument that

> no state-created danger claim is cognizable where, as here, the alleged
> violation is based on a state actor's endangerment of a fellow government
> employee. While the Due Process Clause does not guarantee state employees
> "certain minimal levels of safety and security" in the workplace, *Collins v. City
> of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992),
> we have long held that a government employee may bring a substantive due
> process claim against his employer if the state compelled the employee to be
> exposed to a risk of harm not inherent in the workplace, *see Kaucher v. Cty. of
> Bucks*, 455 F.3d 418, 430–31 (3d Cir. 2006); *Eddy v. V.I. Water & Power Auth.*,
> 256 F.3d 204, 212–13 (3d Cir. 2001).

*Kedra*, 876 F.3d at 436 n.6.

Turning to Defendant's argument that Plaintiffs recite elements of a state-created-

danger claim but do not plead corresponding facts, the Court finds that the specific

55

averments contained in Count X are conclusory assertions related to the elements of a state-created-danger claim which do not satisfy the standard set out in *Twombly*, 550 U.S. at 555, and its progeny. (Doc. 36 ¶¶ 233-238.)  However, Count X also incorporates by reference all preceding allegations.  (*Id.* ¶ 232.)  Thus, Defendant Lendacky and the Court must look beyond the allegations set out in the specific count and consider facts pled in the Second Amended Complaint which may support the plausibility of Plaintiffs' state-created-danger claim.  *Iqbal*, 556 U.S. 662, 678.  With previous claims considered in this Memorandum Opinion, the Court found that allegations contained in the Second Amended Complaint and incorporated by reference into specific counts indicated that Defendants' sparse arguments proffered in support of dismissal were inadequate.  Here, after conducting a similar analysis related to the second and fourth elements of a state-created-danger claim addressed in Defendants' supporting brief (Doc. 44 at 29, 30), the Court finds Defendant Lendacky's conclusory argument does not show entitlement to dismissal.

The second element of a state-created-danger claim requires a plaintiff to show that the state official "acted with a degree of culpability that shocks the conscience." *Kedra*, 876 F.3d at 436 (internal quotation omitted).  "The exact level of culpability required to shock the conscience, however, depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action." *Kedra*, 876 F.3d at 437 (citing *Phillips*, 515 F.3d at 240–41; *Cty. of Sacramento v. Lewis*, 523 U.S.

833, 848–54 (1998)).  The Circuit Court then set out three potential levels of culpability

identified in earlier cases:

> In "hyperpressurized environment[s] requiring a snap judgment," an official must actually intend to cause harm in order to be liable. *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015) (internal quotation marks omitted). In situations in which the state actor is required to act "in a matter of hours or minutes," we require that the state actor "disregard a great risk of serious harm." *Sanford* [*v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)]. And where the actor has time to make an "unhurried judgment[ ]," a plaintiff need only allege facts supporting an inference that the official acted with a mental state of "deliberate indifference." *Id.* at 309.

*Kendra*, 876 F.3d at 437.

Facts alleged in the Second Amended Complaint either directly or inferentially aver

that Defendant Lendacky knew of Defendant Homza's deficient qualifications and knew or

had reason to know that the K-9 team failed to complete required training and she neither

imposed discipline nor took corrective action after the incident with Plaintiff Fought.  (Doc.

36 ¶¶ 61, 63-69, 89-90.)  Based on these allegations, Defendant Lendacky had the

opportunity to exercise "unhurried judgment."  Thus, to sustain this claim, Plaintiffs had to

plead facts that Defedant Lendacky acted with deliberate indifference, which our Circuit

Court has described variously

> as a "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted), or "willful disregard" demonstrated by actions that "evince a willingness to ignore a foreseeable danger or risk," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997). While categorically different from "intent to cause harm," which is the threshold mental state reserved for officials in "hyperpressurized" situations where "snap judgment[s]" may be required, *Vargas*, 783 F.3d at 973,

deliberate indifference "has an elusive quality to it," *Sanford*, 456 F.3d at 301, "fall[ing] somewhere between intent, which 'includes proceeding with knowledge that the harm is substantially certain to occur' and negligence, which involves 'the mere unreasonable risk of harm to another,' " *Morse*, 132 F.3d at 910 n.10.

*Kedra*, 876 F.3d at 437 (3d Cir. 2017).   *Kedra* determined that deliberate indifference in the substantive due process context is governed by an objective standard: deliberate indifference exists "when the risk of harm is so obvious that it should be known."  *Id.* at 439.

The fourth element of a state-created-danger claim requires a plaintiff to show that "the official affirmatively used his authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had he never acted."  *Kedra*, 876 F.3d at 436 (internal quotation omitted).  As stated in *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013), "the requirement of an actual affirmative act is not intended to turn on semantics of act and omission. Instead, the requirement serves to distinguish cases where officials might have done more from cases where officials created or increased the risk itself."  *Id.* at 179 (internal quotation omitted).

Considering this legal framework, to prevail on her asserted grounds for dismissal of the state-created-danger claim, Defendant Lendacky would have to show that Plaintiffs Fought and A. Falcone have not alleged sufficient facts which plausibly support the inference that Defendant Lendacky acted with deliberate indifference regarding conduct related to Defendant Homza and the canine unit and she did not act in a way that created or

increased the risk of the harm sustained by Plaintiffs Fought and A. Falcone.  The Court finds that Defendant Lendacky has failed to make the required showing.

In the supporting brief, Defendant Lendacky does not consider facts asserted in the Second Amended Complaint which arguably support the plausibility of Plaintiffs' state-created-danger claim.  Rather, she generally states that "instead of pleading facts that correspond to each prong of the state-created-danger test, Plaintiffs merely recite each prong and argue that former Chief Lendacky's conduct meets each one." (Doc. 44 at 30 (citing Doc. 36 ¶¶ 234, 236).)  Though, the cited paragraphs may simply correspond to prongs of the cause of action (*id.*), factual allegations found elsewhere in the Second Amended Complaint are incorporated by reference into the state-created-danger claim and must be considered.  A review of the Second Amended Complaint indicates that facts alleged arguably either directly or inferentially aver that Defendant Lendacky knew of Defendant Homza's deficient qualifications and knew or had reason to know that the K-9 team failed to complete required training and she neither imposed discipline nor took corrective action after the incident with Plaintiff Fought when she knew or should have known that maintaining Defendant Homza and Chase on active status would expose civilians and officers to a potentially dangerous condition. (Doc. 36 ¶¶ 61, 63-69, 89-90, 141, 145.)

In their opposition brief, Plaintiffs assert the following:

[d]espite Defendants' attempts to dissect plaintiffs Fought and Falcone's claims for state-created danger, the factual elements which led to their injuries are premised upon the same deficient conduct by Defendants. Instantly, the Plaintiffs were the specific victims of an otherwise foreseeable injury at the hands of an untrained, unqualified and unsupervised Defendant Homza. Defendants knew that Defendant Homza both lacked the requisite time of service to be assigned to the canine unit and failed to complete required training, therefore injury caused by Defendant Homza's police dog were foreseeable and fairly direct. Additionally, Defendants City and Lendacky, by failing to redress the deficient training of Defendant Homza and his canine, demonstrated their willful disregard for the safety of Plaintiffs Fought and Falcone. By allowing the canine to remain in service after viciously mauling Plaintiff Fought, without ensuring additional training, Defendants placed Plaintiff Falcone in a zone of danger that is outside the general zone of danger inherent in simply being a police officer. Moving to the third and fourth prongs of the test articulated above, it is clear that there existed a relationship between state actor and Plaintiff, and that the state actors created the space for the harm to occur, where Plaintiff Fought was unlawfully detained by Defendant Homza, and Plaintiff Falcone was placed in the unfortunate circumstance of working alongside Defendant Homza and his canine. The cases where the state-created danger theory has applied were based on "discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury. *Kneipp* [*v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996)]. Here, the facts to establish said state-created danger have been sufficiently plead, and Plaintiffs must be given latitude to conduct discovery on this issue.

(Doc. 55 at 24-25.)

In the reply brief (Doc. 56), the state-created-danger claim is not discussed.

Therefore, not only does Defendant Lendacky not consider relevant factual assertions

contained in the Second Amended Complaint, but she does not address the factual

allegations set out in support of the claim in Plaintiffs' brief (Doc. 55 at 24-25). While

Defendants state that Plaintiffs improperly rely on the existence of the discovery process to

substantiate their claims (Doc. 56 at 4-5), their broad assertion is legally deficient and relies on examples which indicate they are importing matters properly considered at the summary judgment phase into the motion to dismiss context (*see, e.g., id.* at 4 (citing the need to "identify a failure to provide specific training" where *Carter* stated that "insistence that [the plaintiff] must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh," 181 F.3d at 357-58)).

Defendants cannot just point to what a claimant must ultimately prove to prevail on a stated cause of action, gloss over factual allegations related to that claim, and, without applying fact to law under the 12(b)(6) standard, assert they are entitled to dismissal. Because this is precisely what Defendant Lendacky has done here, she has not satisfied her burden of showing she is entitled to dismissal of Plaintiffs' state-created-danger claim.

## I. Count XI – 42 U.S.C. § 1983 Custom and Policy

In Count XI, Plaintiff Fought brings a claim against all Defendants pursuant to 42 U.S.C. § 1983 based on municipal customs and policies which violate citizens' civil rights. (Doc. 36 ¶¶ 242-251.)  Defendants assert that this claim must be dismissed with prejudice because Plaintiff Fought does not provide the necessary factual support for his claim.  (Doc. 44 at 31.)  Plaintiff Fought responds that his claim "for excessive force as a custom or policy in violation of § 1983 must proceed to the discovery phase of litigation" based on Defendants' knowledge of the issues related to Defendant Homza's hiring and training and that Defendant Homza "was openly and notoriously weaponizing the canine during his

patrols of the City of Wilkes-Barre."  (Doc. 55 at 26-27.)  The Court concludes that this claim is properly dismissed without prejudice.

Where there is no express policy on the pertinent issue and the plaintiff is therefore attempting to prove that one official's misconduct was not an isolated occurrence, allegations of a single act of constitutional violation does not show a custom or policy. *See, e.g., Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).  As summarized in *Brown v Pittsburgh*, 586 F.3d 263 (3d Cir. 2009),

> the Supreme Court has explained [that], "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing ... municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). The rationale for this rule is straightforward. "[A] single incident of police misbehavior by a single policeman is insufficient as *sole* support for an inference that a municipal policy or custom caused the incident." *Id.* at 832, 105 S.Ct. 2427 (Brennan, J., concurring); *see id.* at 822–24, 105 S.Ct. 2427 (plurality opinion) (contrasting the facially unconstitutional, explicit policy at issue in *Monell,* only one application of which was sufficient to trigger municipal liability, to fact patterns that present no such explicit policy, where "more proof than the single incident will be necessary" to establish a causal connection between the incident and some municipal policy); *see also Monell,* 436 U.S. at 691, 98 S.Ct. 2018 (explaining that municipal liability can exist even when "discriminatory practices" are "not authorized by written law," but only if such practices are sufficiently "permanent and well settled as to constitute a 'custom or usage' with the force of law" (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970))).

*Brown*, 586 F.3d at 292–93.

Defendants state that Plaintiff Fought "makes sweeping, conclusory allegations of police brutality in the City without providing any factual support," and, as Plaintiff Fought alone brings this count stemming from his incident with Defendant Homza, the claim is based on a single incident which is insufficient to demonstrate a custom or policy.  (Doc. 44 at 31-32.)

As noted above, Plaintiff Fought responds that his "claim for excessive force as a custom or policy in violation of Section 1983 must proceed."  (Doc. 55 at 26.)  He provides the following grounds for his assertion:

> before the incident with Plaintiff, Defendants City and Lendacky were on notice that Defendant Homza did not meet the requirements for appointment to the canine unit, had failed to attend required training sessions with the canine, and was openly and notoriously weaponizing the canine during his patrols of the City of Wilkes-Barre. Defendants City and Lendacky knowingly failed to take any action to correct said behavior, thereby exposing Plaintiff Fought to the foreseeable injury at the hands of Defendant Homza and his canine. *See Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence.")

(Doc. 55 at 26-27.)

With this argument, Plaintiff Fought does not point to a facially unconstitutional policy which would allow a *Monell* claim on a single incident of unconstitutional activity or identify factual allegations contained in the Second Amended Complaint which would support a causal connection between the incident and a municipal policy or custom condoning the use of excessive force.  (*Id.*)  Plaintiff Fought asserts that "[m]unicipal liability attaches when 'execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" (Doc. 55 at 26) (quoting *Bielevicz*, 915 F.2d at 850).)  He acknowledges that "[a] custom exists where there is a 'course of conduct, although not specifically endorsed or authorized by law" that has become "so well-settled and permanent as virtually to constitute law.'"  (*Id.*) However, Plaintiff Fought identifies only a single incident, i.e., his own July 2017 encounter with Defendant Homza, in support of his § 1983 claim.  (*Id.* at 27.)

Plaintiff Fought does not attempt to indicate how the appointment of Defendant Homza to the canine unit or his failure to attend training sessions shows "excessive force as a custom or policy."  (*Id.* at 26-27.)  Nor does he provide factual support for his contention that Defendant Homza "was openly and notoriously weaponizing the canine during his patrols of the City of Wilkes-Barre."  (Doc. 55 at 27.)  Though the statement implies more than one incident of some kind with Defendant Homza's K-9 team, such a vague and conclusory allegation does not show a course of conduct which Defendants City and Lendacky failed to correct.

Further, Plaintiff Fought's reliance on *Chew v. Gates* is misplaced in that the Ninth Circuit Court noted that

> [t]here is little doubt that a trier of fact could find that Chew's injury [which resulted from a police dog's bite and hold] was caused by city policy. In the district court, the city conceded, for purposes of summary judgment, the truth of Chew's contention that departmental policy authorized seizure of *all* concealed suspects—resistant or nonresistant, armed or unarmed, violent or nonviolent—by dogs trained to bite hard and hold.

27 F.3d at 1444.  The Circuit Court then concluded that "[c]onstruing city policy as the appellee concedes we must, it doubtless could be found to be the "moving force" behind Chew's injury.  *Id.* at 1444-45.  Here, as noted above, Plaintiff Fought points to no specific policy, and Defendants make no concession on this or any related point.

Based on the foregoing discussion, Plaintiff Fought's § 1983 custom and policy claim in Count XI is properly dismissed.  Rather than dismissing the claim with prejudice as requested by Defendants (Doc. 44 at 32), the Court will dismiss Count XI without prejudice and allow Plaintiff Fought an opportunity to amend.

## J.  Count XII  – Negligent Hiring

In Count XII, Defendant Fought lodges a claim for negligent hiring against Defendant City and Defendant Lendacky.  (Doc. 36 at 39.)  For the reasons discussed below, the Court concludes Plaintiffs' negligent hiring claim as to Defendant Fought is appropriately dismissed without prejudice.

In their supporting and responsive briefs, the parties consider Counts XII and XIII as 42 U.S.C. § 1983 claims.  (Doc. 44 at 32-33; Doc. 55 at 28-29.)  In *Board of County Commissioner of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997), the Court considered the situation where a plaintiff brought a 42 U.S.C. § 1983 action seeking damages against the county alleging, among other things that, a county sheriff's deputy had arrested her with excessive force and the county was liable for her injuries because the sheriff had hired the deputy without adequately knowing his background which included driving infractions and

65

other misdemeanors, including assault and battery. 520 U.S. at 399-400. The plaintiff

prevailed after a jury trial and the Fifth Circuit affirmed, holding that the county was subject

to municipal liability for a sheriff's single decision to hire a deputy after an inadequate

background check. *Id.* The Court noted that

> [w]here a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, . . . there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

520 U.S. at 410.   The Court then concluded that

> a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

*Id.* at 412.   The Court did not conclude that a single instance of inadequate screening could

never trigger municipal liability but found that the evidence in the case case was insufficient

to support a finding that, in hiring the deputy, the sheriff disregarded a known or obvious risk

of injury.   *Id*. To test the link between the hiring decision and the injury, the Court identified

the relevant question to be whether a full review of the deputy's record reveals that the

sheriff should have concluded that the deputy's use of excessive force would be a plainly

obvious consequence of the hiring decision.  *Id.* at 412-13.

Defendants contend that Plaintiff Fought makes no allegation that Defendant Homza

"had a history of using excessive force or K-9-related violence while effectuating an arrest."

(Doc. 44 at 33.)  On this basis, they maintain that the Second Amended Complaint is devoid

of any proof that the Defendants were "'deliberately indifferent' to a risk of harm to Mr.

Fought when they selected Officer Homza for the K-9 Unit."  (*Id.*)

Though Plaintiffs cast their negligent hiring claims in § 1983 terms in their opposition

brief, the authority cited does not pertain to municipal hiring decisions.  (Doc. 55 at 28-29

(citing *City of Canton*, 498 U.S. at 388; *Montgomery v. De Simone*, 159 F.3d 120, 126-27

(3d Cir. 1998); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)).)  *City of

Canton* addresses *Monell* liability in the context of failure to train claims lodged against the

municipal defendant, 489 U.S. at 388-89; *Montgomery* and *Bonenberger* both consider §

1983 *Monell* claims that the municipal defendants failed to train, discipline or control the

municipal employee, 159 F.3d at 127-27; 132 F.3d at 25.  Thus, the authority cited does not

support Plaintiffs' negligent hiring claims.  Moreover, Plaintiff Fought's argument does not

address the central question identified by the Supreme Court in *Brown* and argued by

Defendants: he does not point to any factual allegations that would support municipal

culpability because he makes no allegation that something in Defendant Homza's

background would make his use of excessive force in making an arrest a plainly obvious

consequence of the hiring decision.  *See Brown*, 520 U.S. at 412.  Therefore, Plaintiff

Fought has not stated a plausible § 1983 claim based on Defendant Homza's hiring.[7]

The Court will dismiss Plaintiff Fought's negligent hiring claim without prejudice and with

leave to amend.

## K.  Count XIII – Negligent Hiring

In Count XIII, Defendant A. Falcone lodges a negligent hiring claim against

Defendants City and Lendacky.  (Doc. 36 at 40.)  Defendants rely on the same argument

proffered as to Plaintiff Fought in support of the dismissal of the claim brought by Plaintiff A.

Falcone.  (*Id.*)  Because the cited authority and argument supporting dismissal of Plaintiff

Fought's claim involved the constitutional injury of excessive force (*id.* at 32-33 (citing

*Brown*, 520 U.S. at 412)), the same authority and argument cannot be applied to Plaintiff A.

Falcone who did not allege that he suffered the constitutional injury of excessive force (*see*

Doc. 36).  Therefore, Defendants have not satisfied their burden of showing that Plaintiff A.

Falcone's negligent hiring claim must be dismissed.

## L.  Count XIV – Negligent Retention

In Count XIV, Defendant A. Falcone lodges a claim for negligent retention against

Defendants City and Lendacky.  (Doc. 36 at 41.)  Defendants assert that this claim must be

---

[7]  To the extent that the negligent hiring claims set out in Plaintiffs' Second Amended Complaint can be read to be state law claims (*see* Doc. 36 ¶¶ 255-274), Plaintiffs do not make that argument in their opposition brief, but rather support the viability of the claims based on § 1983 principles.  (See Doc. 55 at 28-29.)

dismissed with prejudice because he has failed to satisfy a necessary element of a negligent retention claim.  (Doc. 44 at 34.)  Plaintiff A. Falcone responds that he has pled sufficient facts to survive Defendants' motion on this claim.  (Doc. 55 at 30.)  The Court concludes that Defendants City and Lendacky have not satisfied their burden of showing that Plaintiff A. Falcone's negligent retention claim must be dismissed.

Both parties cite to *Gunn v. On the Border Acquisitions, LLC*, 298 F. Supp. 3d 811 (E.D. Pa. 2018), as controlling the negligent retention claim.  *Gunn* set out the following framework:

> A plaintiff alleging negligent retention under Pennsylvania law, must demonstrate that her loss resulted from,
>
> > (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee.
>
> *Belmont v. MB Inc. Partners, Inc.*, 708 F.3d 470, 477–78 (3d Cir. 2013) (citing *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968)). The primary issue in a negligent retention claim "is not whether the employer's actions were reasonable in light of the circumstances...[i]nstead, the court must determine whether 'the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control over his employee.'" *Schofield* [*v. Trustees of University of Pennsylvania*, 894 F. Supp. 194, 196 (E.D. Pa. 1995) (quoting *Dempsey, Inc.*, 431 Pa. at 569, 246 A.2d 418).

*Gunn*, 298 F. Supp. 3d at 825-26.  As made clear in a footnote, the Pennsylvania law to which *Gunn* refers is the Restatement (Second) of Torts § 317 (1965).  298 F. Supp. 3d at

825 n.12.  In *Dempsey*, 246 A.2d at 421, the Supreme Court of Pennsylvania adopted the

Restatement (Second) of Torts § 317 to guide lower courts in their evaluation of negligent

retention claims.

> Section 317 provides as follows:
>
> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> > (ii) is using a chattel of the master, and
>
> (b) the master
>
> > (i) knows or has reason to know that he has the ability to control his servant, and
> > (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965).  Comment a of § 317 adds that

> [t]he rule stated in this Section is applicable only when the servant is acting outside the scope of his employment. If the servant is acting within the scope of his employment, the master may be vicariously liable under the principles of the law of Agency. See Restatement of Agency, Second, Chapter 7.

*Id.*

> This authority indicates that the analysis upon which the parties rely is only

applicable if Defendant Homza was acting *outside* the scope of his employment.  If he was

acting *within* the scope of his employment, the authority cited does not apply but principles

of agency may.

Those principles indicate that "[u]nder the common law, a master is vicariously liable

for its servant's negligent acts committed within the scope of employment." *Montgomery*

*Hosp. & Med. Ctr. v. Bureau of Med. Care Availability & Reduction of Error Fund (MCARE*

*Fund)*, 201 A.3d 909, 914 (Pa. Commw. Ct. 2019) (citing *Smalich v. Westfall*, 440 Pa. 409,

269 A.2d 476 (1970) (citing Restatement (Second) of Agency § 219 (1958)).  Section 228(1)

of the Restatement (Second) of Agency addresses the scope of employment and provides:

> (1) Conduct of [an employee] is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the [employer], and
> >
> > (d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].

Restatement (Second) of Agency § 228(1) (1958).  Section 228(2) provides that an

employee's conduct "is not within the scope of employment if it is different in kind from that

authorized, far beyond the authorized time or space limits, or too little actuated by a purpose

to serve the [employer]." *Id.* § 228(2).  As noted in *Justice v. Lombardo*, 208 A.3d 1057,

1067 (Pa. 2019), subsequent sections of the Restatement provide additional criteria for

assessing whether conduct falls within the scope of employment.  208 A.3d at 1067 (citing

§§ 229-231, 235).

> *Justice* also explained that the Pennsylvania Supreme Court has

> long held that whether a particular act of an employee is within the scope of his
> employment is ordinarily a question of fact for the jury. *Orr* [*v. William J. Burns
> Intern. Detective Agency*, 12 A.2d 25, 27 (Pa. 1940))]; *Brennan v. Merchant &
> Co., Inc.*, 205 Pa. 258, 54 A. 891, 892 (1903) (citing *Guinney v. Hand*, 153 Pa.
> 404, 26 A. 20 (1893)). We have explained that the only exception to this well-
> established rule is where neither the facts nor the inferences to be drawn from
> them are in dispute. *Orr*, 12 A.2d at 27 (citing *Brennan*, 54 A. at 892). In such
> a case, the court may decide the scope of employment question as a matter of
> law. *Brennan*, 54 A. at 892. However, where more than one inference may be
> drawn from the facts, the issue of whether an employee was acting within the
> scope of employment is for the jury. *See Iandiorio v. Kriss & Senko Enterprises,
> Inc.*, 512 Pa. 392, 517 A.2d 530, 534 (1986).

*Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).

Considering the parties' arguments presented in their briefs, the foregoing authority

indicates that no determination on the plausibility of Plaintiff A. Falcone's negligent retention

claim can be made at this time.  Throughout their brief, Defendants portray Defendant

Homza's actions as consistent with the exercise of his duties and argue in the context of the

negligent retention claim that "[t]here are no factual allegations pleaded that would indicate

that . . . Officer Homza's actions took place outside the scope of his employment."  (Doc. 44

at 34-35.)   Plaintiff A. Falcone does not address the scope-of-employment question but his

argument on this claim (Doc. 55 at 30) and factual allegations contained in the Second

Amended Complaint (Doc. 36 ¶¶ 122-134) implicate the issue of whether he acted within

the scope of his employment, i.e., whether the force he intentionally used was "not unexpectable" by his employer which would render his action within the scope of his employment or was "different in kind from that authorized" which would render it outside his scope of employment.  Restatement (Second) of Agency § 228.  Thus, on the current record, Defendants have not shown the propriety of their proffered legal framework or their entitlement to dismissal of Plaintiff A. Falcone's negligent retention claim.

## M. Qualified Immunity

Defendants final argument is that Defendants Homza and Lendacky are entitled to qualified immunity on the 42 U.S.C. § 1983 claims and these claims must be dismissed because the Fourth Amendment does not confer the right to be free from an officer's use of a K-9 in effectuating an arrest.  (Doc. 44 at 36 (citing *Moore*, 222 F. App'x at 170).)  Plaintiff Fought responds that Defendants are not entitled to qualified immunity as "it cannot be said that Defendant Homza was unaware of the constitutional violation that would result form his unlawful seizure of Plaintiff Fought when he weaponized his police dog."  (Doc. 55 at 32.)  The Court concludes that Defendants have not satisfied their burden of showing they are entitled to qualified immunity.

This Court has summarized the doctrine of qualified immunity as follows:

Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This doctrine, known as qualified immunity, provides officials

performing discretionary functions not only defense to liability, but also "immunity from suit." *Crouse v. S. Lebanon Twp.*, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *abrogated in part by Pearson*, 555 U.S. 223. If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. *Pearson*, 555 U.S. at 816; *Saucier*, 533 U.S. at 201-02. The Supreme Court of the United States has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his or her conduct violates that constitutional right. *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006) (citing *Saucier*, 533 U.S. at 202).

*Bomba v. Dep't of Corr.*, No. 3:16-CV-1450, 2018 WL 7019254, at *7–8 (M.D. Pa. Sept. 4, 2018), *report and recommendation adopted in part, rejected in part sub nom. Bomba v. Commonwealth of Pennsylvania Dep't of Corr.*, No. 3:16-CV-01450, 2019 WL 177471 (M.D. Pa. Jan. 11, 2019). In this legal construct, the objective reasonableness of the defendant's conduct rather than the defendant's subjective intent is relevant to the determination of whether the doctrine applies. *Harlowe v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court clarified that the procedure set out in

*Saucier* is often appropriate, but was no longer mandatory:  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

In *Kane v. Barger*, 902 F.3d 185 (3d Cir. 2018), the Circuit Court distilled from Supreme Court precedent the following principles for determining when a constitutional right may be deemed clearly established:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point to find that a right was clearly established. Rather, to be clearly established, a right need only have a sufficiently clear foundation in then-existing precedent. In this inquiry, we look first to applicable Supreme Court precedent.  However, even if none exists, it may be possible that a robust consensus of cases of persuasive authority in the Courts of Appeals could clearly establish a right for purposes of qualified immunity.
>
> Defining the right at issue is critical to this inquiry, and we must frame the right in light of the specific context of the case, not as a broad general proposition.  This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.  Accordingly, it need not be the case that the exact conduct has previously been held unlawful so long as the contours of the right are sufficiently clear.  Said another way, we do not require a case directly mirroring the facts at hand, so long as there are sufficiently analogous cases that should have placed a reasonable official on notice that his actions were unlawful.  As such, officials can still be on notice that their conduct violates established law even in novel factual circumstances.

902 F.3d at 194-195 (internal quotations and citations omitted).

Defendants rely on *Moore's* statement that the "'[u]se of a police dog to bite and hold a suspect is not per se unreasonable.'"  (Doc. 44 at 36 (quoting *Moore*, 222 F. App'x at 170).)  On this basis alone, they maintain that the first prong of *Saucier* has not been met, i.e., whether the defendant violated a constitutional right.  (*Id.*)

Defendants' assertion misses the mark on several fronts: a simple conclusory statement cannot satisfy Defendants' burden of showing they are entitled to qualified immunity, *see, e.g., Thomas v. Independence Twp.,* 463 F.3d 285, 293 (3d Cir. 2006); what is "not per se unreasonable" is not necessarily per se reasonable such that the use of a police dog to bite and hold a suspect can *never* be a use of excessive force; and the detailed analysis set out in the Court's discussion of Count I includes the relevant inquiry regarding the reasonableness of force used, an inquiry which Defendants do not undertake in support of their claim, *see supra* pp. 15-17.  Finally, Defendants' conclusion that the force used by Defendant Homza was per se reasonable is contrary to the Court's determination that Plaintiff Fought's claim for excessive force survives Defendants' motion.  *See supra* p. 20.

Defendants' assertion regarding the second *Saucier* prong, i.e., whether the constitutional right in question was "clearly established" at the time the defendant acted," 533 U.S. at 201-02, is similarly wanting.  Stating that neither Defendants Homza nor Lendacky "understood that their actions violated Plaintiffs' rights, as Plaintiffs' rights were, in fact, not violated" (Doc. 44 at 37), Defendants provide no discussion of the second prong

and cite only their previous arguments.  (*Id.*)  As the Court found Defendants' arguments

lacking as to Counts I and II, *see supra* pp. 13-34, the Court finds their conclusory assertion

here inadequate to show entitlement to qualified immunity.


## V.  CONCLUSION

For the reasons discussed above, the Court will grant Defendants' Motion to Dismiss

Plaintiffs' Second Amended Complaint (Doc. 41) as modified in part and deny it in part.  In

so doing the Court makes no determination on the merits of Plaintiffs' remaining claims and

has only assessed their sufficiency in terms of the grounds for dismissal proffered by

Defendants.  Defendants' Motion will be granted as modified insofar as Count XI (42 U.S.C.

§ 1983 Custom and Policy) and Count XII (Negligent Hiring) will be dismissed without

prejudice.  Plaintiff will be granted leave to amend these claims.  The Motion will be denied

in all other respects.  A separate Order will be filed simultaneously with this Memorandum

Opinion.


  *s/ Robert D. Mariani*
Robert D. Mariani
United States District Judge